OPINION OF THE COURT
Joan B. Lefkowitz, J.
The petition for judgments pursuant to CPLR article 78 and CPLR 3001 is granted in part and denied in part.
Factual and Procedural Background Federal and State Pollutant Discharge Elimination Permits
The Federal Water Pollution Control Act (also known as the Clean Water Act [hereafter, CWA]) (see 33 USC § 1251 et seq.), inter alia, created the national pollutant discharge elimination system (hereafter, NPDES) (33 USC § 1342), whereby the point source discharge of water pollution to surface waters was prohibited except in compliance with a permit therefor issued by the Administrator of the United States Environmental Protection Agency (hereafter, EPA) or by a state agency authorized to do so by the EPA.
Article 17 of the Environmental Conservation Law,
“create [d] a state pollutant discharge elimination system (SPDES) to insure that the State of New York shall possess adequate authority to issue permits regulating the discharge of pollutants from new or existing outlets or point sources into the waters of the state, upon condition that such discharges will conform to and meet all applicable requirements of the [CWA] . . . , and rules, regulation, guidelines, criteria, standards and limitations adopted pursuant thereto . . . , and to participate in the [NPDES] created by the [CWA].” (ECL 17-0801.)
In 1975, EPA authorized New York to issue such permits through the state’s SPDES program, which is administered by *609 respondent, New York State Department of Environmental Conservation (hereafter, DEC).
The CWA contemplates the issuance of an individual permit for each applicant who seeks permission to discharge pollutants. However, due to the vast number of separate point sources from which pollutants may be discharged into the nation’s waterways and water bodies, and the intolerable task that would be involved in considering and determining an individual application for each one, EPA regulations also provide for the issuance of a “[g]eneral permit[, which is] an NPDES ‘permit’ issued under [40 CFR] § 122.28 authorizing a category of discharges under the CWA within a geographical area.” (40 CFR 122.2; see also Natural Resources Defense Council, Inc. v Costle, 568 F2d 1369, 1380-1382 [DC Cir 1977] [holding that EPA’s use of general permits is allowed under the CWA as a necessary alternative to outright exemptions from NPDES permit requirements].) The provisions of section 122.28 are applicable to state NPDES programs, such as New York’s SPDES program, “[pjrovided that States which do not seek to implement the general permit program under § 122.28 need not do so.” (40 CFR 123.25 [a] [11].)
New York has chosen to implement the general permit program.
Thus, pursuant to ECL 70-0117 (6),
“(a) Under the [SPDES] program . . . , [DEC] may issue a general permit ... to cover a category of point sources of one or more discharges within a stated geographical area which (i) involve the same or substantially similar types of operations, (ii) discharge the same types of pollutants, (iii) require the same effluent limitations or operating conditions, (iv) require the same or similar monitoring, and (v) which will result in minimal adverse cumulative impacts.
“(b) General permits can only be issued ... if, by virtue of their nature and location, [DEC] determines such discharges are more appropriately controlled under a general permit than under individual permits.”
The CWA requires an NPDES permit, and therefore the ECL requires an SPDES permit, for the discharge of storm water from a municipal separate storm sewer system (hereafter, MS4) (see 33 USC § 1342 [p]; ECL 17-0808), and CWA rules authorize *610 a permitting agency to issue general permits for such discharges (see 40 CFR 122.26 [a] [5]; 122.28 [a] [2] [i]).
The Instant Proceeding
In January 2003, DEC issued the first statewide “SPDES General Permit For Stormwater Discharges from Municipal Separate Storm Sewer Systems (MS4s), Permit No. GP-02-02” ([hereafter, the 2003 MS4 Permit], a copy of which has not been provided to the court). By its terms, the 2003 MS4 Permit became effective on January 8, 2003, and was to expire in 2008. DEC commenced the renewal process in 2007. The permit was renewed for two years in 2008 (see “SPDES General Permit For Stormwater Discharges from Municipal Separate Storm Sewer Systems [MS4s], Permit No. GP-0-08-002, Effective Date: May 1, 2008, Expiration Date: April 30, 2010” [hereafter, the 2008 MS4 Permit], a copy of which is reproduced at S2450-S2541of the certified record),[1] then for five years in 2010 (see “SPDES General Permit For Stormwater Discharges from Municipal Separate Storm Sewer Systems [MS4s], Permit No. GP-0-10-002, Effective Date: May 1, 2010, Expiration Date: April 30, 2015” [hereafter, the 2010 MS4 Permit], a copy of which is annexed to the petition as exhibit 7 and is reproduced as Rec Ex at 1-116).
The 2010 MS4 Permit “authorizes discharges of stormwater from small [MS4s] as defined in 40 CFR 122.26 (b) (16).” (2010 MS4 Permit, Part I.A.1, Rec Ex at 6.)[2] Certain small MS4s were not authorized to discharge under the 2003 MS4 Permit but were required to gain coverage under the 2008 MS4 Permit (see 2008 MS4 Permit, Part II.B, Rec Ex at S2455-S2456), and small MS4s covered under the 2008 MS4 Permit were required to gain coverage under the 2010 MS4 Permit (see 2010 MS4 Permit, Part II.C, Rec Ex at 8). DEC contends that there are hundreds of small MS4s in New York State and it elected to use a general permit, rather than issue individual permits, “[because covered MS4s involve many of the same or similar is *611 sues.” (Respondent’s mem of law in opposition to petitioners’ verified petition [hereafter, MOL Opp] at 3.)[3]
On June 28, 2010, petitioners commenced the instant proceeding in which they “request that the Court declare portions of the [2010 MS4 Permit] to be inconsistent with . . . legal requirements . . . and . . . remand it to [DEC], with instructions to modify it consistent with all applicable legal requirements.” (Petition at 2; see also “WHEREFORE” clause, id. at 26.) As alleged in the petition, petitioner, Natural Resources Defense Council, Inc., “is a not-for-profit organization existing under the laws of the state of New York,” which “has members in New York State who use and enjoy water bodies in the state, such as Long Island Sound and Atlantic coastal waters, which are polluted by stormwater runoff discharged by MS4s in Westchester, Nassau, and Suffolk Counties that are covered by the [2010 MS4 Permit].” (Id. at 3.) Each of the eight other petitioners is allegedly an “organization” or “corporation” — seven of which are described as “not-for-profit” or “non-profit” — existing under the laws of New York State, and which has members who use and enjoy waterways or water bodies which are polluted by storm water runoff discharged by MS4s in one or more counties that are covered by the 2010 MS4 Permit. (See id. at 3-6.) In support of the petition petitioners have submitted the affidavits of eight persons who are allegedly members of the various petitioner organizations and corporations, reside in the state, and use and enjoy waterways or water bodies which are polluted by storm water runoff discharged by MS4s in one or more counties that are covered by the 2010 MS4 Permit.
In the first of four separately stated and numbered causes of action, petitioners allege that the 2010 MS4 Permit violates 33 USC § 1342 (p) (3) (B) (iii) and ECL 17-0808 (3) (c) because it fails to require MS4s to reduce their discharges of pollutants to the maximum extent practicable. In their second cause of action petitioners allege that, in violation of ECL 17-0811 (5) and 17-0813, the 2010 MS4 Permit fails to ensure compliance with water quality standards. In their third cause of action petitioners allege that, in violation of 33 USC § 1318 (a) and ECL 17-0815 (8), the 2010 MS4 Permit fails to require MS4s to conduct any monitoring of their storm water discharges. In their fourth *612 cause of action petitioners allege that the 2010 MS4 Permit violates the public participation requirements of 33 USC § 1251 (e) and § 1342 (a) (1) and (j).
By verified answer (hereafter, answer), which was served and filed in January 2011, DEC opposes the petition and alleges as its sole affirmative defense that the determinations which petitioners challenge “are reasonable and rational and fully consistent with law.” (Answer at 12.) DEC does not contest the standing of any of the petitioners to challenge its determinations or object to the venue in which petitioners have brought said challenge. The instant proceeding was deemed fully submitted with the filing in March 2011 of petitioners’ reply to new matters asserted in respondent’s answer.
Discussion
This court’s review of the determinations which petitioners challenge is limited to “whether [said] determination[s were] made in violation of lawful procedure, [were] affected by an error of law[ — i.e., unlawful — ]or [were] arbitrary and capricious or an abuse of discretion.” (CPLR 7803 [3].)
Petitioners’ First Cause of Action
The 2010 MS4 Permit is unlawful to the extent that it incorporates a permitting scheme that creates an impermissible self-regulatory system in violation of 33 USC § 1342 (p) (3) (B) (iii) and ECL 17-0808 (3) (c). Under both the CWA and the ECL, inter alia, a permit authorizing storm water discharges from MS4s “shall require controls to reduce the discharge of pollutants to the maximum extent practicable [hereafter, MEP], including management practices, control techniques and system, design and engineering methods, and such other provisions as the [EPA or DEC] determines appropriate for the control of such pollutants.” (33 USC § 1342 [p] [3] [B] [iii]; ECL 17-0808 [3] [c].) Thus, a permit, whether individual or general cannot authorize such discharges before the permitting agency has ensured that the practices, techniques and methods that any given operator of an MS4 has decided to utilize will in fact reduce the discharge of pollutants to the MEP (See Environmental Defense Ctr., Inc. v United States Envtl. Protection Agency, 344 F3d 832, 855 [9th Cir 2003], cert denied sub nom. Texas Cities Coalition on Stormwater v United States Environmental Protection Agency, 541 US 1085 [2004] [hereafter EDC].)
Pursuant to Part II.A of the 2010 MS4 Permit, “[p]ermit coverage is obtained by submission of a complete and accurate
*613 Notice of Intent [to discharge (hereafter, NOI)].”[4] (2010 MS4 Permit, Part II.A, Rec Ex at 8.)
Pursuant to Part II.D:
“1. In order for stormwater discharges from small MS4s to be newly authorized under this SPDES general permit, an operator must:
“a. within 180 days of receiving written notice from [DEC] that a permit ... is required, prepare an NOI . . . ; and
“b. submit the NOI [to DEC].
“2. Operators who submit a complete NOI in accordance with the requirements of this SPDES general permit are authorized to discharge stormwater from small MS4s, under the terms and conditions of this SPDES general permit, upon written notification from [DEC] that a complete NOI has been received.” (id. Part II.D, Rec Ex at 9.)
Entities that were covered under the 2008 MS4 Permit “continue[d] to have authorization to discharge on an interim basis for up to 180 days from the effective date of this SPDES general permit[ — i.e., until October 27, 2010 — ] . . . and may gain coverage under this SPDES general permit by submission of their 2009 Annual Report due in June 2010.” (Id. Part II.C, Rec Ex at 8.) Thus, for entities that had been covered under the 2008 MS4 Permit and were seeking coverage under the 2010 MS4 Permit, submission of the 2009 Annual Report was the equivalent to the submission of an NOI.
Under the 2010 MS4 Permit, the “controls to reduce the discharge of pollutants” that must be required under ECL 17-0808 (3) (c) are encompassed in a stormwater management program (hereafter, SWMP). (See id. Part X.B, Rec Ex at 95; MOL Opp at 6 [“(t)he (2010 MS4 Permit) principally operates by requiring each MS4 operator to create a (SWMP)”].) Thus, each “newly authorized” MS4 “must develop . . . , implement . . . , and enforce a [SWMP] designed to [meet the MEP standard] in order to protect water quality and to satisfy the appropriate water quality requirements of the ECL and the CWA.” (2010 MS4 Permit, Part IVA, Rec Ex at 14.) The SWMP is memorialized in a stormwater management program plan (hereafter, SWMP Plan) which “should include a detailed written explanation of all management practices, activities and other techniques the *614 [MS4] has developed, planned and implemented for their SWME” (Id. Part X.B, Rec Ex at 96.) However, “[t]he SWMP [P]lan is a separate document from the NOI and[, according to the 2010 MS4 Permit,] should not be submitted with the NOI . . . unless requested.” (Id.) And newly authorized MS4s have as much as three years after DEC determines that their NOI is complete to develop and implement an SWMP.[5]
Instead, each MS4 operator must include in its NOI the same information that will eventually be part of its SWMP Plan, including a description of its proposed SWMP and discussions of each of six minimum control measures that it is required to implement.[6] (See id. Parts VII, VIII, Rec Ex at 28-67.) Thus, a complete NOI, not an actual SWMP is the vehicle through which DEC purports to effectuate its statutory mandate to require controls to reduce the discharge of pollutants to the MEP; and because discharge is authorized upon its submission the information contained in a complete NOI, as opposed to an actual SWMP Plan, is the sole basis upon which DEC purports to determine whether the MEP standard has in fact been met. Consequently, under the 2010 MS4 Permit, an NOI is functionally equivalent to a detailed application for an individual SPDES permit[7] to discharge storm water and DEC’s determination that an NOI is complete equates to the issuance of an individual permit, so that the mere submission of a complete NOI is deemed to constitute compliance with the standard of reducing the discharge of pollutants to the MEP
However, a determination that an NOI is complete does not satisfy DEC’s mandate under ECL 17-0808 (3) (c). In determining the application of an MS4 operator for an individual SPDES *615 permit DEC is required to conduct a review, which would ordinarily include, for example, an inspection by DEC staff of “the project site or facility and surrounding area to verify existing conditions, [and a] determin[ation of] the accuracy of materials submitted in the application.” (6 NYCRR 621.6 [b]; see also 6 NYCRR 750-1.7.) And discharges would not be authorized unless and until the application was granted and the permit issued, upon completion of the review process (see 6 NYCRR 750-1.6 [c]; 750-1.7 [e]) — in other words, only after DEC had ensured that the applicant had developed and implemented “controls to reduce the discharge of pollutants to the maximum extent practicable” (ECL 17-0808 [3] [c]). Indeed, a “determination of completeness” or incompleteness is only the preliminary step in the usual application review process (see 6 NYCRR 621.6 [a]), so the failure to conduct a substantive examination of the content of a “complete” application would be patently inadequate. There is no statutory requirement that NOIs must be subject to the same precise review process as are applications for individual permits — nor do petitioners contend otherwise — but neither the 2010 MS4 Permit nor DEC rules concerning general permits (see 6 NYCRR 750-1.21) require that DEC conduct a similar or equally meaningful review of an NOI.
DEC contends that a determination of completeness is sufficient because “[i]n order to be complete, the NOI requires MS4 operators to certify that their SWMP contains all control measures required by the [2010 MS4 Permit], and to note which specific actions the MS4 operator is taking to implement those control measures.” (Affidavit of Angus Eaton, PE. [hereafter, Eaton aff], at 11.) In actuality, however, while the preface to the NOI form advises an operator seeking discharge authorization to “make sure you comply with all permit requirements including the requirement to develop, document, and implement a Storm Water Management Program Plan,” by executing the NOI the person acting for the operator certifies only “that the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.” (Notice of Intent, Rec Ex at 787, 800.) Since an operator has up to three years after submission to comply with the “permit requirement to develop, document, and implement” (id. at 787) an SWMR its certification of the truth and accuracy of the information contained in an NOI on the date of submission establishes little more than its plans for the future. Further, nothing in the 2010 MS4 Permit requires DEC to review the control measures which any *616 given MS4 operator allegedly plans to develop to ensure that such measures will in fact reduce pollutant discharge to the MEE In effect, at least until an SWMP Plan is submitted to and reviewed by DEC, each operator that submits a complete NOI is authorized to discharge storm water while it decides for itself what reduction in pollutant discharge would meet the MEP standard, what control measures should be utilized, and whether that standard will in fact be met. Thus, while the certification may strengthen any future enforcement action DEC might pursue should the operator fail to effectuate its stated plans, it does not satisfy DEC’s statutory mandate.
In EDC, the Ninth Circuit Court of Appeals remanded aspects of EPA’s Storm Water Phase II Rule pursuant to which operators of small MS4s were authorized by a general NPDES permit to discharge storm water upon submission of an NOI. The court distinguished the NOI utilized under the Phase II Rule from those used under other general permits. Unlike the “traditional general permitting model,” the court explained, “the Phase II Rule requires that each NOI contain information on an individualized pollution control program that addresses each of the six general criteria specified in the Minimum Measures.” (344 F3d at 853.) Thus, the court held, under the Phase II Rule, an NOI was functionally equivalent to an application for an individual NPDES permit. (See id.) But EPA was not required to conduct a meaningful review of each NOI prior to discharge authorization, as it would be required to conduct before granting an application for an individual permit. (See 344 F3d at 854-856.) The court held that such a permitting scheme “creates an impermissible self-regulatory system” (id. at 854) in violation of 33 USC § 1342 (p) (3) (B) (iii) because the permitting agency could “allow permits to issue [ — meaning authorizations to discharge storm water upon submissions of NOIs — ] that would do less than require controls to reduce the discharge of pollutants to the maximum extent practicable” (id. at 855).
And in Waterkeeper Alliance, Inc. v United States Envtl. Protection Agency (399 F3d 486, 498-504 [2d Cir 2005]), the Second Circuit discussed EDC at length and applied the same reasoning in remanding aspects of the concentrated animal feeding operations (CAFO) Rule which EPA had promulgated to regulate the emission of water pollutants by large concentrated animal feeding operations (hereafter, Large CAFOs). Under the CAFO Rule, a Large CAFO seeking permission to discharge pollutants was required to develop and implement a nutrient *617 management plan (hereafter, NMP).[8] “The [CWA] unquestionably provides that all applicable effluent limitations[9] must be included in each NPDES permit.” (399 F3d at 502 [citations omitted].) The court held that because “the terms of [NMPs] constitute effluent limitations, . . . the CAFO Rule — by failing to require the terms of the [NMPs] be included in the NPDES permits — violates the [CWA].” (Id. at 502-503.) The court remanded the CAFO Rule’s permitting scheme because, like the permitting scheme that was remanded in EDC, “the CAFO Rule does nothing to ensure that each Large CAFO has, in fact, developed a [NMP] that satisfies the [applicable] requirements[10] . . . [, and] fails to require that permitting authorities review the [NMPs] developed by Large CAFOs before issuing a permit that authorizes land application discharges.” (399 F3d at 499.)
DEC’s attempts to distinguish the permitting scheme of the 2010 MS4 Permit from the permitting schemes which were struck in EDC and Waterkeeper are unavailing. DEC alleges that “[t]o address the concerns highlighted by [EDC], DEC revised its [2003 MS4 Permit] in 2008 to include a larger suite of required BMPs[11] that ensure effective program implementation and Optional BMPs to allow for each MS4 to tailor their program to fit their unique needs.” (Eaton aff at 15.) DEC also contends that the 2010 MS4 Permit “incorporates the agency review that the courts found lacking in [EDC and Waterkeeper]” (MOL Opp at 19), and identifies provisions in the 2010 MS4 Permit pursuant to which an operator authorized to discharge thereunder must at some point thereafter submit various pol *618 lutant discharge control measures for DEC review and approval (see id. at 20-21).
However, none of the distinctions to which DEC refers cure the defect for which the EDC court remanded the Phase II Rule and the Waterkeeper court remanded the Large CAFO Rule. In neither opinion was the decision to remand predicated upon the quantity of the pollutant discharge control measures that a newly authorized discharger must or could implement. To the contrary, in each case the court found, as does this court in the instant proceeding (see supra), that the submission — whether it be an NOI or NMP — upon which discharge authorization was granted contained sufficient information about the operator’s development and implementation of the required pollutant discharge control measures to constitute the functional equivalent to a detailed permit application. Nor was either decision based upon whether such measures and information would or would not have been subject to agency review after the operator began discharging under the permit.
Rather, the problem with the permitting schemes in both the Phase II Rule and the CAFO Rule was that the initial determinations of what particular control measures would be implemented and whether those measures would in fact reduce pollutant discharge to the level mandated by the applicable statute or regulation were left to each operator to make after it had already been authorized to discharge. Thus, each scheme was defective because of the possibility that under it the permitting agency might determine that the submission which constituted the functional equivalent to a permit application was complete or adequate without conducting a meaningful review, so nothing prevented a newly authorized discharger from misunderstanding, misrepresenting or misapplying the terms of the general permit or its own situation, and proposing or adopting a set of control measures for itself that would reduce pollutant discharges by less than the applicable standard. (See EDC, 344 F3d at 855; Waterkeeper, 399 F3d at 500.) The permitting scheme incorporated in the 2010 MS4 Permit suffers from the same defect.[12]
Indeed, this court has had occasion to deal with the consequences of that defect in DEC’s initial iteration of the same *619 permitting scheme in the 2003 MS4 Permit. In State of New York v City of Yonkers (14 Misc 3d 1229[A], 2004 NY Slip Op 51908[U] [Sup Ct, Westchester County 2004]), the State of New York (hereafter, the State) brought an action against the City of Yonkers (hereafter, Yonkers), inter alia, for a permanent injunction compelling Yonkers to abate its discharges of untreated sewage into the Bronx River. (See 2004 NY Slip Op 51908[U], *1.) Yonkers, which is a small MS4, was authorized under the 2003 MS4 Permit — and the permitting scheme incorporated therein — to discharge storm water into the Bronx River following its submission of an NOI and SWMP in March 2003. (See id. at *9, *12.)
According to the court (Nicolai, J.):
“Yonkers most attractive argument is that it is in compliance with all laws . . . because it does have the required SPDES permit, and companion Storm-water Management Program . . . , viz., General SPDES permit GP-02-02[, i.e., the 2003 MS4 Permit]. The State does not dispute that Yonkers has the permit, but contends that this does not allow the discharge of raw sewage into the River. The State also contends that the Yonkers SWMP is inadequate.” (Id. at *12.)
After explicating the terms of the 2003 MS4 Permit and confirming that the discharge of raw sewage was not authorized thereunder, the court noted that “Yonkers contends, however, that there is a safe harbor provision in Part IV of the Permit [SWMP] which allows the discharge of sewage into the River, at least until March 2008, when the SWMP is to be fully operative.” (Id. at *13.) Purportedly, Yonkers had inferred the “safe harbor” to which it referred from a footnote to the third of the six required minimum control measures delineated in the permit. (See id.)[13] The court examined the provision at issue and the State’s contentions as to its actual meaning, and concluded that “there is no safe harbor for a discharge of *620 untreated sewage into the waters of the State, even though the DEC may abstain from legal action, if a Control Measure 3 program is deemed adequate.” (Id. at *14.) The court granted the State’s motion for summary judgment on its claims for injunctive relief. (See id. at *11-14.)
Although the State’s motion had been fully submitted at least five months (see id. at *6), and the decision was rendered more than one year (see id. at *1), after EDC was decided, the court was not called upon to make any determination concerning the lawfulness of the 2003 MS4 Permit. But the facts of the case provide a dramatic illustration of how such a permitting scheme creates an impermissible self-regulatory system in violation of 33 USC § 1342 (p) (3) (B) (iii) and ECL 17-0808 (3) (c), and why it cannot stand. In short, a MS4 operator that was authorized under the general 2003 MS4 Permit — the predecessor to the 2010 MS4 Permit — to discharge storm water despite that DEC had not conducted a meaningful review of the operator’s pollutant discharge control measures was discharging raw sewage into a state waterway because it had misunderstood, misrepresented and/or misapplied the terms of said permit, and the control measures which it had adopted were found, upon DEC’s belated review, to have been inadequate to reduce pollutant discharge to the MEP
Therefore, DEC’s determination to incorporate such a permitting scheme in the 2010 MS4 Permit was affected by an error of law within the meaning of CPLR 7803 (3).
Petitioners’ Second Cause of Action
With one exception, the 2010 MS4 Permit does not violate the statutory mandate that it insure compliance with applicable water quality standards.
Pursuant to 33 USC § 1313 (d) (1),
“(A) Each State[, which is authorized to issue NPDES permits,] shall identify those waters [or parts thereof] within its boundaries for which the [required] effluent limitations . . . are not stringent enough to implement any water quality standard applicable to such waters . . . [, and]
“(C) . . . shall establish for [said] waters . . . the total maximum daily load [hereafter, TMDL], for those pollutants which [EPA] identifies ... as suitable for such calculation.”
“Basically, water quality standards are provisions of State and Federal law, which define the quality goals *621 of a water body or some portion of it, by designating the use or uses to be made of the water, by setting criteria necessary to protect the uses, and by incorporating an antidegradation policy designed to prevent the gradual deterioration of the quality of the water body.” (Matter of Niagara Mohawk Power Corp. v New York State Dept. of Envtl. Conservation, 82 NY2d 191, 194 [1993]; see also American Paper Inst., Inc. v United States Envtl. Protection Agency, 996 F2d 346, 349-350 [DC Cir 1993].)
“Loading” is a measure of the amount of matter or thermal energy, consisting of either man-caused pollutants or natural means, that is introduced into a receiving water. (See 40 CFR 130.2 [e].) “Loading capacity ... [is t]he greatest amount of loading that a water can receive without violating water quality standards.” (40 CFR 130.2 [f].) “Wasteload allocation [hereafter, WLA, is t]he portion of a receiving water’s loading capacity that is allocated to one of its existing or future point sources of pollution^ such as a MS4]” (40 CFR 130.2 [h]). And TMDL is “[t]he sum of the individual WLAs for point sources and [load allocations] for nonpoint sources and natural background.” (40 CFR 130.2 [i].) Thus, DEC must identify waters or portions thereof which violate applicable water quality standards, and after establishing TMDLs therefor DEC calculates the WLA for each MS4 authorized to discharge into such waters.
Pursuant to ECL 17-0811, “SPDES permits . . . shall include provisions requiring compliance with ... 1. effluent limitation . . . [and] 5. any further limitations necessary to insure compliance with water quality standards adopted pursuant to state law.” (See also 40 CFR 122.4 [d].) Pursuant to 6 NYCRR 750-1.11 (a), “[t]he provisions of each issued SPDES permit shall ensure compliance with ... (5) any [effluent] limitations . . . (ii) necessary to implement a [TMDL]/[WLA]/load allocation.” Further, pursuant to ECL 17-0813, “SPDES permits . . . may contain compliance schedules,” and pursuant to 6 NYCRR 750-1.14 (a) “[t]he purpose of these schedules is to achieve compliance by the permittee with applicable effluent limitations [and] water quality standards.” With respect to water quality standards, the 2010 MS4 Permit sets forth different requirements depending upon whether DEC has established a TMDL for the water into which an MS4 will be discharging. (See 2010 MS4 Permit, Part III.B, Rec Ex at 11-14.)
For waters or portions thereof which DEC has identified as being in violation of water quality standards but has not yet *622 established a TMDL, a covered MS4 “must ensure no net increase in its [pollutant] discharge.” (See id. Part III.B.l, Rec Ex at 11.) Petitioners contend that this provision is unlawful because a water so identified is by definition receiving excess pollutants, so that compliance with the applicable statutory standard would necessarily require a reduction of pollutants being discharged thereto; since “no net increase” is not a reduction, the provision fails to insure compliance with the applicable standard as mandated by ECL 17-0811 (5). (See petitioners’ mem of law in support of art 78 petition [hereafter, MOL] at 32-34.)
The “no net increase” provision is not unlawful.
“Where the interpretation of a statute or its application involves knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom, the courts regularly defer to the governmental agency charged with the responsibility for administration of the statute. If its interpretation is not irrational or unreasonable, it will be upheld.” (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980].)
The reduction in pollutant discharge required of each MS4 seeking permit coverage in order to insure compliance with the applicable standard for any particular water cannot be quantified without a WLA, which, in turn, cannot be computed until a TMDL has been established. Meanwhile, as DEC contends, “[t]he adoption of the ‘no net increase’ standard ensures that these waters do not become more polluted while DEC continues its sampling, source quantification and related studies.” (MOL Opp at 28.) Moreover, petitioners do not challenge the provisions of the 2010 MS4 Permit concerning compliance with water quality standards once a TMDL is established where there had been no TMDL when an MS4 was first authorized to discharge. (See 2010 MS4 Permit, Part III.B.3, Rec Ex at 13-14.)[14] This court finds that the “no net increase” limitation represents a rational and reasonable interpretation of DEC’s statutory mandate during the interim from initial authorization to the establishment of a TMDL.
*623 For waters where DEC has established a TMDL, the 2010 MS4 Permit requires that MS4s discharging to such waters reduce pollutant discharge — referred to in the permit as “Pollutant Load Reduction” (hereafter, PLR) — according to a prescribed timetable, dependent upon the class of pollutant and the particular water into which it is being discharged. (See id. Part III.B.2, Rec Ex at 11-13; Part DC, Rec Ex at 68-86.) PLRs are calculated using the applicable WLA for each water. (See id. Part IX, Rec Ex at 68 [“(PLRs) are the reductions necessary from the discharge loads associated with MS4s that, when combined with reductions in the discharge loads from non-MS4s to the waterbody, will meet water quality standards”].) In order to achieve the required PLR by the applicable deadline, covered entities are required to modify their SWMPs to include, in addition to the pollutant discharge control measures required of all MS4s, “watershed specific additional requirements” — referred to in the permit as “Watershed Improvement Strategies” (hereafter, WISs) — and to submit their WISs to DEC according to another prescribed timetable. (See id. Part IX, Rec Ex at 68-86.)
Petitioners contend that these provisions are unlawful because, inter alia: (1) PLRs “are expressed as a percentage reduction, from an unstated baseline, rather than as an absolute cap” (MOL at 34); (2) WLAs are expressed “only as aggregates of all MS4s discharging to each affected waterbody,” rather than as “individual discharge limits for each MS4,” in violation of ECL 17-0811 (5) (id. at 35); (3) covered entities are authorized to discharge “without substantive review by DEC to ensure the[ir] WISs are sufficient to achieve compliance with TMDL waste load allocations” (id. at 39), and; (4) the timetables for WISs and PLRs “fail to create a meaningful ‘compliance schedule’ as that term is defined by state and federal law and regulations” (id. at 36). These contentions will be addressed seriatim.
(1) The expression of PLRs as a percentage reduction rather than as an absolute cap does not render the 2010 MS4 Permit unlawful. DEC determined that the baseline against which such percentages would be measured will be incorporated from the applicable TMDL for each affected water body. (See e.g. Pathogen Watershed Improvement Strategies Guidance Document Draft, Rec Ex at 907-932.) That determination was neither arbitrary, capricious nor an abuse of discretion within the meaning of CPLR 7803 (3). (See Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mam *624 aroneck, Westchester County, 34 NY2d 222, 230-232 [1974] [defining the standard of judicial review under the arbitrary and capricious, and abuse of discretion tests].)
(2) The expression of WLAs as aggregates does not violate the ECL. Under ECL 17-0811 (5) an SPDES permit must include provisions requiring compliance with any effluent limitations necessary to insure compliance with water quality standards. “WLAs constitute a type of water quality-based effluent limitation” (40 CFR 130.2 [h]) which are necessary to insure compliance with water quality standards, and the 2010 MS4 Permit includes provisions requiring compliance with said effluent limitations (see 2010 MS4 Permit, Part IX, Rec Ex at 68-86). There is no statutory or regulatory requirement that prohibits the expression of WLAs as aggregates in such permit provisions. Therefore, the permit does not violate ECL 17-0811 (5).
(3) The failure to require substantive review of a WIS before an MS4 is authorized to discharge does not render the 2010 MS4 Permit unlawful. Under the permit, the relationship of a WIS to water quality standards is roughly analogous to that of an NOI to the MEP standard. Unlike an NOI, however, a WIS is not functionally equivalent to an application for an individual NPDES permit. (Compare with EDC, 344 F3d at 853.) Therefore, petitioners’ contentions to the contrary notwithstanding, the absence of a requirement for predischarge review of a WIS does not create an “impermissible self-regulatory permitting regime” (MOL at 39).
(4) The 2010 MS4 Permit was affected by an error of law within the meaning of CPLR 7803 (3) to the extent that it fails to specify schedules for covered entities to achieve compliance with applicable effluent limitations and water quality standards. In general, as DEC contends (see MOL Opp at 30), the inclusion of compliance schedules in an SPDES permit is not mandatory. (See ECL 17-0813; 6 NYCRR 750-1.14 [a].) However, “[w]ith respect to any discharge that is not in compliance with applicable limitations, applicable water quality standards, or other applicable requirements, [DEC] shall establish specific steps in a compliance schedule designed to attain compliance within the shortest reasonable time.” (6 NYCRR 750-1.14 [a].) And where the time in which compliance must be attained exceeds nine months, “a schedule of compliance shall be specified in the permit.” (6 NYCRR 750-1.14 [b].) The inclusion in the 2010 MS4 Permit of timetables for the submission of WISs and achievement of PLRs assumes that some, if not all, of the *625 discharges by MS4s covered thereunder are not in compliance with applicable effluent limitations and water quality standards at the time of authorization, yet all of the dates for compliance provided in the WIS and PLR timetables are more than nine months from the effective date of the permit. (See 2010 MS4 Permit, Part IX, Rec Ex at 68-86.) Consequently, the specification in the permit of compliance schedules was mandatory and the failure to do so was unlawful.
Petitioners’ Third Cause of Action
The 2010 MS4 Permit is not unlawful for its failure to require MS4s covered thereunder to monitor their discharges. Pursuant to ECL 17-0815, “SPDES permits shall include ... 8. recording, reporting, monitoring, and sampling requirements applicable under the [CWA].” Pursuant to 33 USC § 1318 (a), “whenever [it is] required to carry out the objective of the [CWA] . . . (A) [a permitting agency] shall require the owner or operator of any point source to . . . (iii) install, use, and maintain such monitoring equipment or methods ... as [it] may reasonably require.” (See also 6 NYCRR 750-1.13 [a] [“(a)ny discharge authorized by a SPDES permit shall be subject to such requirements for monitoring ... as may be reasonably required by (DEC)”].) Thus, the inclusion in an SPDES permit of a requirement that covered entities self-monitor their discharges is discretionary. DEC chose to satisfy its statutory mandate through other means, such as including myriad recording and reporting requirements (see e.g. 2010 MS4 Permit, Part VC.3, Rec Ex at 20-21), ambient monitoring of affected water bodies (see e.g. 2010 MS4 Permit, Part IX, Rec Ex at 68 [“(u)ltimately, the effectiveness of the load reductions in meeting water quality standards will be verified by ambient monitoring of the affected waterbody”]), and computer modeling of pollutant loading (see id. Part III.B, Rec Ex at 11-14; Eaton aff at 13-14). Therefore, DEC’s determination not to include a self-monitoring requirement in the 2010 MS4 Permit was neither arbitrary, capricious nor an abuse of discretion within the meaning of CPLR 7803 (3). (See Matter of Pell, 34 NY2d at 230-232.)
Petitioners’ Fourth Cause of Action
The 2010 MS4 Permit is unlawful to the extent that it incorporates a permitting scheme that violates the CWA’s public participation requirements. Pursuant to 33 USC § 1251 (e), “[p]ublic participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the [EPA] or any State . . .
*626 shall be provided for, encouraged, and assisted by the [EPA] and the States.” As part of its obligation to provide for, encourage and assist such public participation, an agency may issue an NPDES or SPDES permit authorizing the discharge of pollutants only after there has been an opportunity for public hearing (see 33 USC § 1342 [a] [1]), and “[a] copy of each permit application and each permit issued under this section[, i.e., a NPDES or SPDES permit,] shall be available to the public” (33 USC § 1342 [j]). In accordance with these obligations, New York State mandates under ECL 17-0805 (1) (a) that there be
“[p]ublic notice of a complete application for a SP-DES permit, [which notice must include]: . . . (viii) a statement that copies of the permit application . . . are available upon request; and (ix) a statement that written comments or requests for a public hearing on the permit application . . . may be filed by a time and at a place specified.”
Petitioners do not dispute that the process pursuant to which the 2003 MS4 Permit was renewed in 2008, then re-renewed and issued as the 2010 MS4 Permit, was the subject of extensive public participation. Moreover, the 2010 MS4 Permit provides that “NOIs will be public noticed and an opportunity for public comment provided on the contents of submitted NOIs.” (Part II.B, Rec Ex at 8.) Petitioners contend, however, that the permitting scheme pursuant to which MS4 operators are authorized to discharge under the 2010 MS4 Permit violates the CWA and the ECL in several respects because it does not provide an opportunity for public hearings on NOIs, and it does not provide for any public participation, prior to discharge authorization, as to an operator’s proposed effluent limitations, such as SWMPs and WISs. (See MOL at 21-23, 28, 39-40.)
To the extent that the 2010 MS4 Permit fails to provide an opportunity for public hearings on the contents of NOIs before MS4 operators are authorized to discharge thereunder it violates both 33 USC § 1342 (a) (1) and ECL 17-0805 (1) (a). Such a provision is required under the CWA because NOIs are functionally equivalent to detailed applications for individual NPDES permits. (See EDC, 344 F3d at 856-858 [holding that because “NOIs are functionally equivalent to . . . permit applications^) . . . (w)e therefore reject the Phase II Rule as contrary to the clear intent of Congress insofar as it does not provide for public *627 hearings on NOIs as required by 33 U.S.C. § 1342(a)(1)”].)[15] For the same reason, a complete NOI is subject to the same state public notice requirements as is any other “complete application for a SPDES permit” (ECL 17-0805 [1] [a]), including the provision of an opportunity for public hearings. So the failure of the 2010 MS4 Permit to provide such opportunity violates ECL 17-0805 (1) (a) (ix).
However, the failure to provide for additional public comment and hearings for every effluent limitation which an MS4 operator proposes to implement via its NOI violates neither the CWA nor the ECL. While effluent limitations are among the aspects of a permit that must be subject to public scrutiny, that requirement is met through public notice, comment and opportunities for hearings on the permit application of which such aspects are a part. Unlike NOIs, the effluent limitations of which petitioners speak are not themselves functionally equivalent to permit applications. Thus, they are not discretely within the ambit of 33 USC § 1342 (a) (1) and (j), or ECL 17-0805 (1) (a).
Therefore, to the extent that the 2010 MS4 Permit incorporates a permitting scheme that does not provide an opportunity for public hearings on NOIs, DEC’s determination was affected by an error of law within the meaning of CPLR 7803 (3).
Accordingly, for the foregoing reasons, the petition is granted to the extent that petitioners’ application for judgment declaring that the issuance by respondent, New York State Department of Environmental Conservation, of SPDES General Permit For Stormwater Discharges from Municipal Separate Storm Sewer Systems (MS4s), Permit No. GP-0-10-002, was contrary to law is granted (see CPLR 3001), and said general permit is annulled and petitioners’ application for judgment directing respondent to issue revisions thereto consistent with this court’s declaratory ruling is granted (see CPLR 7806). To the extent that petitioners seek judgment fixing a timetable pursuant to which respondent must issue revisions to said general permit, the petition is denied.

. The table of contents to the certified record lists documents contained therein by the page numbers at which they appear — the entire certified record consists of 2,823 pages — rather than exhibit number. Hereafter, documents submitted as exhibits in the certified record will be cited as “Rec Ex at — .”

. The 2010 MS4 Permit also defines a small MS4 as a “MS4 system within an urbanized area or other areas designated by the State.” (Rec Ex at 94.) DEC classifies all MS4s, except the City of New York, as “small MS4s.”

. DEC does not allege or contend that its determination to use a general permit was also founded upon any of the other statutory prerequisites therefor (see ECL 70-0117 [6] [a] [i]-[v]; [b]), but petitioners do not challenge said determination or allege that it was made in violation of the statute.

. A blank copy of the Notice of Intent form is reproduced as Rec Ex at 787-801.

. “Operators of small MS4s newly regulated under this SPDES general permit must develop an initial SWMP and provide adequate resources to fully implement the SWMP no later than three years from the date of the individual MS4’s authorization.” (2010 MS4 Permit, Part IVE, Rec Ex at 16.)

. The information that was to have been included in the 2009 Annual Report, which previously covered entities were required to submit in order to remove their interim status and be covered under the 2010 MS4 Permit after October 2010, essentially mirrored the information required for a complete NOI (see 2010 MS4 Permit, Part VC.3, Rec Ex at 20-21; see Annual Report, a blank copy of which is reproduced as Rec Ex at 802-837). Moreover, “[c]overed entities under [the 2008 MS4 Permit] must have prepared a SWMP plan documenting modifications to their SWME” (2010 MS4 Permit, Part IVA, Rec Ex at 14.)

. Petitioners’ contentions to the contrary notwithstanding, the NOI required under the 2010 MS4 Permit is not “merely a checklist of generic practices.” (Petitioners’ reply mem of law [hereafter, Reply MOL], at 6.)

. For the purpose of this analysis, an NMP would be analogous to an SWMP in the context of storm water discharges and to a “functionally equivalent” NOI under the Phase II Rule at issue in EDC.

. “The term ‘effluent limitation’ means any restriction established by a State or the [EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters[ — in other words, pollutant discharge control measures — ] . . . including schedules of compliance” (33 USC § 1362 [11]; see also 6 NYCRR 750-1.2 [a] [31]).

. Pursuant to 40 CFR 412.4 (c) (2), NMPs must “include ‘application rates’ that ‘minimize phosphorous and nitrogen transport from the field to surface waters in compliance with the technical standards for nutrient management established by the [EPA].’ ” (Waterkeeper, 399 F3d at 499.)

. “BMP” is an acronym for best management practice, which the 2010 MS4 Permit defines as “schedules[,] activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of waters of the state” (Part X.B, Rec Ex at 88; see also 6 NYCRR 750-1.2 [a] [12]) — in other words, pollutant discharge control measures.

. Although the parties did not address the issue in depth, the permitting scheme incorporated in the 2010 MS4 Permit was likewise defective relative to entities that had been covered under the 2008 MS4 Permit. Since the 2009 Annual Report was the equivalent to an NOI for such entities (see 2010 MS4 Permit, Part II.C, Rec Ex at 8), it was also functionally equivalent to an ap *619 plication for an individual permit and the mere submission thereof was likewise deemed to constitute compliance with the MEP standard. Indeed, such entities were authorized to discharge — albeit on an interim basis — under the 2010 MS4 Permit for up to six months before submitting their 2009 Annual Report (see id.), much less following any meaningful review.

. The 2010 MS4 Permit requires the same control measure, with the same definition, sans footnote, as did the 2003 MS4 Permit. (See 2010 MS4 Permit, Part VII.A.S.a, Rec Ex at 34, and compare with language quoted in State of New York v City of Yonkers, 2004 NY Slip Op 51908[U], *13.)

. Nor do petitioners claim that DEC has been lax in its ongoing efforts to establish TMDLs for each of the hundreds of waters which are in violation of water quality standards, or seek a moratorium on the issuance of SPDES permits until that task has been accomplished.

. See contra Texas Ind. Producers & Royalty Owners Assn. v Environmental Protection Agency, 410 F3d 964, 977-978 (7th Cir 2005) (holding that EPA’s failure to comply with public notice and hearing requirements before authorizing discharges under the Phase II Rule did not violate CWA because— disagreeing with the holding in EDO — an NOI is not “the functional equivalent of a permit application” [410 F3d at 978 n 13]).