===================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-------------------------------------------------------------------
No. 48
In the Matter of Natural
Resources Defense Council, Inc.,
et al.,
          Appellants,
      v.
New York State Department of
Environmental Conservation,
          Respondent.

          Lawrence M. Levine, for appellants.
          Barbara Underwood, for respondent.
          Nadia B. Ahmad et al.; Citizens Campaign for the
Environment; East of Hudson Coalition; City of New York et al.,
amici curiae.

READ, J.:

          Runoff from rain and snow melt courses over roofs,

roads, driveways and other surfaces, picking up pollutants along

the way.  It then passes through municipal storm sewer systems

into rivers and lakes, adding the pollutants accumulated during

its journey to those bodies of water.  These municipal storm

sewer systems thus differ from other entities that discharge

- 1 -

effluents into our State's surface waters (for example, industrial or commercial facilities and sewage treatment plants) in three major ways: precipitation is naturally occurring, intermittent and variable and cannot be stopped; although municipalities operate sewer systems, stormwater contamination results from the often unforeseen or unpredictable choices of individual residents and businesses (for example, to let litter pile up or to use certain lawn fertilizers), as well as decisions made long ago about the design of roads, parking lots and buildings; and because stormwater runoff flows into surface waters through tens of thousands of individual outfalls, each locality's contribution to the pollution of a particular river or lake is difficult to ascertain or allocate through numeric limitations.

Federal and state law prohibit discharges of stormwater from New York's municipal separate storm sewer systems in urbanized areas (referred to as MS4s) without authorization under a State Pollutant Discharge Elimination System (SPDES) permit. As an alternative to an individual SPDES permit, municipal separate storm sewer systems that serve a population under 100,000 (or small MS4s) may seek to discharge stormwater under a SPDES general permit.  The 2010 General Permit -- the subject of this lawsuit -- requires these municipal systems to develop, document and implement a Stormwater Management Program (SWMP) in compliance with detailed specifications developed by the New York

State Department of Environmental Conservation (DEC or the Department) to limit the introduction of pollutants into stormwater to the maximum extent practicable. To obtain initial coverage (i.e., authorization to discharge) under the terms of the 2010 General Permit, small MS4s must first submit a complete and accurate notice of intention (NOI) to DEC.

After the 2010 General Permit took effect on May 1st of that year,[1] the Natural Resources Defense Council, Inc. (NRDC) and seven other environmental advocacy groups (collectively, NRDC) brought this hybrid CPLR article 78 proceeding/declaratory judgment action against DEC to challenge certain aspects of the 2010 General Permit. NRDC claims generally that by allowing small MS4s to gain coverage under the 2010 General Permit based upon an NOI reviewed only for completeness and not subject to an opportunity for a public hearing, DEC has created an "impermissible self-regulatory system" that fails to force local governments to reduce the discharge of pollutants to the maximum

_____

[1]DEC issued the first General Permit in 2003 for a five-year period, and in 2008 issued a revised two-year General Permit, which expired on April 30, 2010. The five-year 2010 General Permit expired on April 30, 2015. A substantively identical new two-year General Permit took effect on May 1, 2015 and expires on April 30, 2017. Almost all the 500 plus small MS4s authorized to discharge stormwater under the challenged 2010 General Permit were initially covered by the 2008 (or, before that, the 2003) General Permit. The 2010 General Permit authorized them to discharge stormwater on an interim basis for up to 180 days after May 1, 2010. These small MS4s gained coverage under the 2010 General Permit by submission of their Annual Reports (discussed later in more detail) due in June 2010; they were not required to and did not submit NOIs.

extent practicable -- the statutory standard -- and violates

federal and state law.[2]  Equating NOIs with applications for

individual SPDES permits, Supreme Court granted partial relief to

NRDC (35 Misc 3d 652 [Sup Ct Westchester County 2012]).  The

Appellate Division, as relevant here, rejected NRDC's federal and

state law challenges to the 2010 General Permit (120 AD3d 1235

[2d Dept 2014]).  We granted NRDC leave to appeal (23 NY3d 901

[2014]), and now affirm.

I.

Background

The NPDES and SPDES Programs

The Federal Water Pollution Control Act Amendments of

1972 (Pub L No 92-500, 86 Stat 816-904 [codified as amended at 33

USC §§ 1251-1388 [2014]), popularly known as the Clean Water Act,

ushered in the modern era of water pollution control whereby

discharges of pollutants from "point sources" (i.e., "any

discernible and confined discrete conveyance" [33 USC § 1362

(14)]) into the waters of the United States are prohibited except

as authorized by a National Pollutant Discharge Elimination

---

[2]As previously observed (see n 1, supra), virtually all the
small MS4s in the State achieved coverage under the 2010 General
Permit by virtue of NOIs that they submitted to DEC for initial
coverage under the 2003 or 2008 General Permits, and their 2009
Annual Reports.  As a result, the practical effect of a ruling in
favor of NRDC is not self-evident, and threatens to create
considerable confusion; i.e., would these small MS4s be required
to resubmit an NOI, or would they be grandfathered? (see 6 NYCRR
750-1.21 [d] [3]).

System (NPDES) permit issued by the Administrator of the United States Environmental Protection Agency (EPA or the Agency). "Generally speaking," the statute envisaged site-specific individual NPDES permits that "place[d] limits on the type and quantity of pollutants that can be released into the Nation's waters" (South Florida Water Mgmt. Dist. v Miccosukee Tribe of Indians, 541 US 95, 102 [2004]).

Although the federal government plays the dominant role in water pollution control under the Clean Water Act, states may continue their own water pollution control regulations as long as they are at least as stringent as federal law demands (33 USC § 1370). And importantly, states are allowed to administer the NPDES permit program for discharges into navigable waters within their borders, subject to the Administrator's approval (33 USC § 1342 [b]). To attain this approval, a state must demonstrate that its permit program meets the requirements of the Clean Water Act and that the state possesses adequate legal authority to implement it (id.). In 1973, the Legislature amended the Environmental Conservation Law to create SPDES, New York's version of NPDES (see L 1973, ch 801 [adding a new title 8 to article 17 of the Environmental Conservation Law and amending other provisions of article 17 to bring them into conformity with new title 8]). EPA approved New York's SPDES program, which is administered by DEC, in 1975.

## EPA's Stormwater Exemption

In its 1973 regulations implementing the NPDES program, EPA excluded discharges from a number of classes of point sources from the permit requirement, including separate storm sewers containing only storm runoff uncontaminated by any industrial or commercial activity (see 38 Fed Reg 18000 [July 5, 1973] [40 CFR former 124.11 (f)]). EPA justified the exclusion as necessary to conserve its regulatory resources for more significant polluters. The United States Circuit Court for the District of Columbia ruled that the Clean Water Act did not give EPA this option, but interpreted the statute to grant the Agency considerable leeway in setting permit terms (see Natural Res. Def. Council v Costle, 568 F2d 1369, 1377 (DC Cir 1977]). Noting its "sensitiv[ity] to EPA's concerns of an intolerable permit load," the D.C. Circuit suggested that area or general permits would be a permissible and "well-established" device for coping with the avalanche of NPDES permit applications anticipated in the wake of its decision (id. at 1380-1381; see also Natural Res. Def. Council v Train, 396 F Supp 1393, 1402 [DDC 1975] [EPA has "substantial discretion to use administrative devices, such as area permits," to make its burden of permit issuance "manageable"]).

## The Water Quality Act

In the Water Quality Act of 1987 (Pub L No 100-4, 101 Stat 7 [codified as amended in scattered sections of 33 USC]) (the Water Quality Act), Congress endorsed permits for municipal stormwater discharges "issued on a system- or jurisdiction-wide

basis" (33 USC § 1342 [p] [3] [B] [i]).  These permits were mandated to "include a requirement to effectively prohibit non-stormwater discharges into the storm sewers," and

> "controls to reduce the discharge of pollutants <u>to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants</u>" (<u>id.</u> at § 1342 [p] [3] [B] [ii], [iii] [emphasis added]).

The Water Quality Act did not define "maximum extent practicable," but section 1342 (p)'s text and legislative history indicate that Congress had in mind something other than conventional end-of-pipe control techniques and numeric effluent limits (<u>see</u> 132 Cong Rec 32, 381 [1986] [remarks of Sen. Stafford, then Chairman of the Senate Environment and Public Works Committee] ["These permits will not necessarily be like industrial discharge permits.  Often, an end-of-pipe technology is not appropriate for this type of discharge"]; <u>see also</u> <u>Defenders of Wildlife v Browner</u>, 191 F3d 1159, 1164-1165 [recognizing that Congress "chose <u>not</u> to include" provisions (like effluent limitations under 33 USC § 1311) for municipal storm-sewer discharges], <u>amended on denial of rehrg</u>, 197 F3d 1035 [9th Cir 1999] [emphasis added]).

The Water Quality Act established a timetable for EPA to issue NPDES permitting regulations and for EPA and states to issue permits for certain categories of stormwater discharges, principally discharges associated with industrial activity and

discharges from large municipal separate stormwater sewer systems
(those systems serving a population of 100,000 or more) (see 33
USC § 1342 [p] [2], [4]).  But for the many small municipal
systems (those serving a population under 100,000), the Water
Quality Act embraced a different approach.

The statute directed the Administrator, in consultation
with the states, to conduct studies and report the results to
Congress before developing a program to regulate stormwater
discharges from these systems (see 33 USC § 1342 [p] [5]).  The
study was meant to identify sources or classes of stormwater
discharges for which NPDES permits were not required by the Clean
Water Act; determine, to the maximum extent practicable, the
extent and nature of their pollution; and develop procedures and
methods to mitigate the effect of these discharges on water
quality (id.).  Congress then directed EPA to "issue regulations
(based on the results of the studies . . . ) which designate
stormwater discharges . . . to be regulated to protect water
quality and [to] establish a comprehensive program to regulate
such designated sources" (id. § 1342 [p] [6]).  This program was
to be designed, "at a minimum," to

> "(A) establish priorities, (B) establish requirements
> of State stormwater management programs, and (C)
> establish expeditious deadlines.  The program [might]
> include performance standards, guidelines, guidance,
> and management practices and treatment requirements, as
> appropriate" (id. [emphasis added]).

### New York's 1988 Legislation

By chapter 360 of the Laws of 1988, the Legislature

amended the Environmental Conservation Law to authorize DEC to

issue general SPDES permits, as allowed by the Water Quality Act.

To this end, new section 17-0808 specified at subdivision three

that

> "[p]ermits for discharges from municipal storm sewers:
>
> "a.  May be issued on a system or jurisdiction-wide basis, pursuant to paragraph (a) of subdivision seven of section 70-0117 of this chapter;
>
> "b.  Shall include a requirement which regulates non-storm-water discharges into the storm sewers; and
>
> "c.  Shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system design and engineering methods, and such other provisions as the commissioner determines appropriate for the control of such pollutants" (Environmental Conservation Law § 17-0808 [3] [emphasis added]; compare 33 USC 1342 [p] [3] [B] [iii], the cognate federal provision).

Additionally, the Legislature amended existing section

70-0117 of the Environmental Conservation Law to include a new

subdivision 7 to provide as follows:

> "(a) Under the [SPDES] program . . ., the department may issue a general permit, upon application or on its own initiative, to cover a category of point sources of one or more discharges within a stated geographical area which (i) involve the same or substantially similar types of operations, (ii) discharge the same types of pollutants, (iii) require the same effluent limitations or operating conditions, (iv) require the same or similar monitoring, and (v) which will result in minimal cumulative impacts.
>
> "(b)  General permits can only be issued for the following categories of discharges, if, by virtue of their nature and location, the department determines such discharges are more appropriately controlled under a general permit than under individual permits:

"(i)  separate storm sewers or stormwater conveyance systems; . . .

"(c)  Any general permit under this subdivision shall set forth the conditions which shall apply to any discharge authorized by such general permit.

"(d)  The department may require any person authorized by a general permit to apply for and obtain an individual permit and the department shall adopt rules and regulations specifying circumstances under which an individual permit may be required.

"(e)  General permits shall be governed by the procedures set forth in this article [70] for the issuance of major permits" (former Environmental Conservation Law § 70-0117 [7], renumbered Environmental Conservation Law § 70-0117 [6] [L 1994, ch 170, § 202]).

The bill that became chapter 360 was drafted by and introduced at the request of DEC, which sought general permitting authority in order to avoid "issuance of thousands of individual SPDES permits covering discharges of heat, stormwater and non-industrial waste as well as . . . discharges of a minor nature[, which] do not require the individual attention the statute currently demands" (Bill Jacket, L 1988, ch 360 at 9 [emphasis added]).  Similarly, DEC explained that general permitting would

"reduce the amount of paperwork and resources dedicated to permitted discharges which do not warrant technical case review.  Past regulation of such discharges has created substantial administrative burdens without corresponding increases in environmental protection. Staff time spent on processing these types of permits detracts from time that could be spent on major and toxic discharges" (id. [emphases added]).

The bill's Senate and Assembly sponsors repeated these rationales (id. at 18, 23, 29).

EPA's Final Rule

EPA promulgated its final rule regulating stormwater discharges from small municipalities' separate stormwater sewer systems on December 8, 1999, effective February 7, 2000 (64 Fed Reg 68722 [Dec 8, 1999] codified at 40 CFR pts 9, 122, 123 and 124]). These so-called Phase II regulations expanded the existing NPDES Phase I stormwater program.[3] The record to support the regulation of small MS4s included the studies and reports to Congress mandated by the Water Quality Act, as well as EPA's evaluation of comments and considerable additional research and studies. Based on this record, EPA determined that surface water contamination from wet-weather discharges from these systems was best controlled by means of measures designed to reduce the quantity of pollutants introduced into stormwater and the volume of stormwater flow rather than end-of-pipe numeric limits (id. at 68753). Accordingly, the regulations required small MS4s to develop and implement a SWMP that identified best management practices to attain "minimum control measures" in six key areas: public education and outreach; public involvement;

_____

[3]As the first step in carrying out the requirements of the Water Quality Act, the Phase I program covered NPDES permitting of stormwater discharges from MS4s serving a population of 100,00 or more and stormwater discharges associated with industrial activity, including construction activities involving five or more acres (33 USC § 1342 [p] [2], [4]; see also 55 Fed Reg 47990 [Nov 16, 1990]). In addition to small MS4s, the Phase II regulations also addressed construction sites that disturb one to five acres and additional sources that might be designated on a case-by-case basis (64 Fed Reg at 68722).

illicit discharge detection and elimination; construction site runoff control; stormwater management in new development and redevelopment; and pollution prevention and good housekeeping of municipal operations (id. at 68736; 68754-68762).

EPA determined that if small MS4s carried out best management practices in accordance with their SWMPs, they would comply with the statutory standard to reduce pollutants to the maximum extent practicable (id. at 68754; see also id. at 68843 [40 CFR 122.34 (a)]); and "[a]bsent evidence to the contrary, . . . presume[d] that a small MS4 program that implements the six minimum measures . . . does not require more stringent limitations to meet water quality standards" (64 Fed Reg at 68753). EPA recommended that small MS4s include the public in developing, implementing and reviewing the SWMP (id. at 68844 [40 CFR 122.34 (b) (2) (ii)]);[4] and required that all records, including a description of the SWMP, must be made available to the public for review and copying at reasonable times during regular business hours (64 Fed Reg at 68846 [40 CFR 122.34 (g)

_____

[4]The 2010 General Permit requires small MS4s to provide the public with the opportunity to participate in the development, implementation, review and revision of the SWMP. In this context, "development" means the "period after initial authorization under [the 2010 General Permit] when [the small MS4] creates, designs or develops activities, BMPs, tasks or other measures to include in [its] SWMP"; and "implementation" means the "period after development of [the] SWMP, where the [small MS4] puts into effect the practices, tasks and other activities in [its] SWMP."

(2)]).[5]

EPA interpreted the Water Quality Act as authorizing it
to develop a stormwater program for small municipalities either
as part of the NPDES permit program or as a stand-alone non-NPDES
program, such as a self-implementing rule.  EPA settled on the
use of NPDES permits instead of a rule for several reasons,
including a desire to maintain consistency with its Phase I
program for stormwater control; to capitalize upon the existing
government infrastructure for administration of the NPDES program
and the regulated community's understanding of how the NPDES
program works; and to provide flexibility in order to facilitate
watershed planning and sensitivity to local conditions (id. at
68739).  EPA did note, however, that "[k]ey provisions" of the
rule "promot[ed] a streamlined approach to permit issuance by,
for example, using general permits" (id. at 68740; see also id.
at 68762 [although the permit to authorize a small MS4's
discharges might take the form of either an individual NPDES
permit issued to one or more facilities as co-permittees or a
general NPDES permit that applied to a group of small MS4s, EPA
"expect[ed]" that most discharges would be authorized or
"covered" under general permits for reasons of administrative
efficiency and reduced paperwork burdens]).  In fact, EPA
recommended using general permits, rather than individual

_____

[5]The 2010 General Permit directs small MS4s to ensure that
copies of SWMPs and Annual Reports are available for public
inspection.

permits, for all stormwater sources newly regulated under its rule (id. at 68737).

A small MS4 that seeks coverage under a general NPDES permit for its stormwater discharges is required to submit an NOI to the permitting authority. The NOI must specify the best management practices to be implemented for each of the six required minimum control measures along with measurable goals for the development and implementation of each best management practice (id. at 68762-68764). Although "[s]everal commenters suggested that EPA require permitting authorities to approve or disapprove the submitted BMPs and measurable goals[,] EPA disagree[d] that formal approval or disapproval by the permitting authority [was] needed" (id. at 68764).[6]

EPA afforded small MS4s up to five years to fully develop and implement their SWMPs,[7] with annual reports required to document progress (id. at 68770, 68846 [40 CFR 122.34 (g)

_____

[6]EPA allows a small MS4 that submits a complete and timely NOI to discharge upon receipt of the NOI by the state permitting authority, after a waiting period specified in the general permit, on a date specified in the general permit or upon receiving notice of inclusion from the state permitting authority (see 40 CFR 122.28 [b] [2] [iv]). By contrast, the 2010 General Permit requires DEC to publish a notice in the Environmental Notice Bulletin when an NOI is received from a small MS4. These notices provide a web link to the actual NOI, and inform the public of the physical location of the NOI and SWMP, which are available for public inspection. The NOI is subject to a 28-day public comment period prior to DEC's authorization of the small MS4's discharges.

[7]DEC reduced the time period from five to three years for the New York program.

(3)]).  The Agency stated that "[t]he permitting authority will use the reports in evaluating compliance with permit conditions and, where necessary, will modify the permit conditions to address changed conditions" (64 Fed Reg at 68770).

### The 2010 General Permit

The 2010 General Permit is a 97-page document, with appendices, which requires small MS4s to develop, document and implement a SWMP that includes 44 mandatory best management practices grouped into the six program components, or minimum control measures.  Many of the mandatory best management practices afford small MS4s little or no choice about what they must do to comply with the 2010 General Permit; others afford more freedom in implementation.  As an example of the latter, under the minimum control measure addressing public outreach, small MS4s must develop and implement an ongoing public education and outreach program, but enjoy flexibility to decide how best to accomplish this in light of local conditions or considerations (e.g., a media campaign, presentations to community groups, outreach to commercial entities, a webpage, printed materials, posters and/or 13 other suggested ways or management practices to raise the public's awareness and engage its participation in reducing pollution of stormwater runoff).

At the other end of the spectrum, the 2010 General Permit imposes highly prescriptive requirements for small MS4s to develop, implement and enforce a program to detect and eliminate

non-stormwater (i.e., illicit) discharges.  The small MS4s must
develop and maintain maps showing the location of all outfalls,
verify each of them in the field and conduct an outfall inventory
in accordance with detailed guidance published on EPA's website.
Further, each small MS4's program must include procedures to
identify areas that are of greatest concern and describe those
areas, available equipment, staff and funding; identify and
locate illicit discharges; eliminate illicit discharges; and
document the steps the small MS4 has taken to implement its
program.

### The NOI and Annual Reports Provided for by the 2010 General Permit

The NOI is currently a 19-page document that sets out
the six minimum control measures, listing the mandatory and
optional best management practices for each.  The small MS4 must
commit to each mandated and any optional best management practice
initially identified in the SWMP;[8] describe initially identified
measurable goals for each of the required or chosen best
management practices, with start and end dates, including work to
be done by partners.  And finally, either a principal executive
or ranking elected official must sign the NOI, certifying that
the information submitted is, to the best of the signer's

---

[8]Small MS4s in specified watershed improvement strategy
areas must identify the additional best management practices that
they will implement in order to reach specified pollutant load
reductions.

knowledge and belief, true, accurate and complete, and
acknowledging awareness of the significant penalties for
submitting false information, including the possibility of fines
and imprisonment for knowing violations.  As noted previously
(see n 6, supra), the NOI is made available to the public for
comment for a 28-day period.  Small MS4s that submit an NOI are
authorized to discharge stormwater upon written notification from
DEC that a complete NOI has been received.  DEC, however, may
also choose to require the small MS4 to submit an application for
an individual SPDES permit or an alternative SPDES general
permit. DEC annually audits up to 10% of all municipal storm
sewers, makes site inspections, reviews citizen complaints and,
where necessary, takes enforcement action.

         The vast majority of New York's 500 plus small MS4s
achieved initial authorization to discharge stormwater prior to
the effective date of the 2010 General Permit; they were able to
maintain coverage under the 2010 General Permit by submitting
their 2009 Annual Reports (see n 1 and 2, supra).  The 2010
General Permit directs small MS4s to make Annual Reports and
SWMPs available for public review; provides for notice of receipt
of 2009 Annual Reports to be published in the Environmental
Notice Bulletin;[9] and requires small MS4s to present draft Annual
Reports to the public and to include its responses to any public

_____

         [9]The 2010 General Permit states that "[f]or public
participation purposes, the [2009] Annual Report will be
considered equivalent to an NOI."

comments (including, as appropriate, any modifications of the
SWMP) when they submit these reports to DEC.  The Annual Report
summarizes the activities performed by the small MS4 during the
reporting period and those planned for the next year, and
includes, among other things, an assessment of compliance with
permit conditions; the appropriateness of the identified best
management practices; and progress toward meeting the measurable
goals for each minimum control measure and achieving the
statutory goal of reducing the discharge of pollutants to the
maximum extent practicable.  DEC's review of Annual Reports
allows the Department to keep tabs on small MS4s and to require
any necessary refinement of best management practices.  DEC
refers to these contemplated successive rounds of reviewing and,
as necessary, finetuning and refocusing best management practices
as the "iterative process" that is the hallmark of the flexible
"maximum extent practicable" standard, which Congress
deliberately chose as best suited for regulating small
municipalities' stormwater discharges.

II.

Discussion

The Clean Water Act

There is no doubt that the 2010 General Permit complies
with EPA's 1999 regulations, which allow permitting authorities
to authorize small MS4s to discharge stormwater under a general
NPDES permit upon receipt of an NOI -- i.e., without any

regulatory review, public notice and comment or opportunity for a public hearing.  There is likewise no doubt that the 2010 General Permit affords more generous regulatory review and public participation than EPA's 1999 regulations require.  But NRDC contends, and the dissent agrees, that the federal courts have held that the regulatory review and public participation features of EPA's 1999 regulations, on which the 2010 General Permit is necessarily modeled, constitute an "impermissible self-regulatory system" in contravention of the Clean Water Act, and that New York courts are bound to follow suit with respect to the New York program.  Stated slightly differently, NRDC and the dissent assert that federal court decisions make clear that the Clean Water Act does not allow DEC to authorize a small MS4's stormwater discharges under the 2010 General Permit without first engaging in an undefined more detailed review of the NOI (and, apparently, the SWMP) and providing the public an opportunity to request a hearing.

After EPA promulgated its 1999 regulations, various environmental, municipal and industry groups brought petitions for review, which were consolidated in the United States Court of Appeals for the Ninth Circuit (see Environmental Defense Ctr., Inc. v EPA, 344 F3d 832 [9th Cir 2003] [EDC]).  The environmental petitioners argued that, by allowing permitting authorities to authorize small MS4s to discharge stormwater on the basis of "unreviewed NOIs," the regulations created an "impermissible

self-regulatory system," and additionally "fail[ed] to provide for public participation as required by the Clean Water Act, because the public receive[d] neither notice nor opportunity for hearing regarding an NOI" (id. at 854, 856).  A divided panel agreed.

Applying Chevron analysis,[10] the EDC majority first determined that the Clean Water Act unambiguously expressed Congress's intent that "EPA issue no permits to discharge from municipal storm sewers unless those permits require[d] controls to reduce the discharge of pollutants to the maximum extent practicable" (id. at 854 [internal citations omitted]), and that EPA's 1999 regulations did not fulfill this plain command.  This was the case, the majority reasoned, because absent a permitting agency's "meaningful review" of the minimum control measures selected by a small MS4,[11] the municipal operator might

---

[10]The United States Supreme Court held in the seminal case of Chevron U.S.A., Inc. v Natural Resources Defense Council, Inc. (467 US 837 [1984]) that federal courts will accept a federal agency's reasonable interpretation of the ambiguous statutory language of statutes that the agency administers.

[11]As pointed out earlier, EPA's 1999 regulations did not require any review of NOIs.  DEC takes the position that its review of NOIs for completeness is "meaningful review"; specifically, DEC does not authorize a small MS4's stormwater discharges until after examining the NOI to make sure that the system operator has committed to carrying out a SWMP that comprehends, at a minimum, 44 mandatory best management practices (clearly identified in the NOI as "required"), and has established measurable goals by which to assess how successfully these best management practices, as implemented, control stormwater discharges to the maximum extent practicable.

"misunderstand[] or misrepresent[] its own stormwater situation and propos[e] a set of minimum measures for itself that would reduce discharges by far less than the maximum extent practicable" (id. at 854-856). The EDC majority also concluded that NOIs (unlike NRDC and the dissent, the court did not mention SWMPs) are "functionally equivalent" to NPDES permit applications, and therefore are subject to the same public availability and public hearing requirements (id. at 857).

The dissenting judge considered the "central issues" in the case to be whether the Clean Water Act allowed EPA to use a general permit system to administer the NPDES program and whether NOIs should properly be regarded as "permits." Citing Chevron, he noted that "resolution of these issues require[d] a complicated weighing of policies (e.g., administrative streamlining vs. robust inquiry) that is precisely what agencies are designed to do and courts are without the resources or experience to do" (id. at 881 [Tallman, J., dissenting]).

In the dissenting judge's view, although the majority correctly recognized that EPA was allowed to use a general permit system, it

> "ignore[d] the effects of the general permit. By filing an NOI, a discharger obligates itself to comply with the limitations and controls imposed by the general permit under which it intends to operate. EPA mandates that all permits (including general permits) condition their issuance on satisfaction of pollution limitations imposed by the Clean Water Act[; t]herefore, the general permit imposes the obligations with which the discharger must comply (including applicable Clean Water Act standards), and EPA's

decision not to review every NOI is not a failure to insure compliance with the [statute]" (id. at 882).

As for the majority's objection that EPA's general permit system did not allow for sufficient public participation, the dissenting judge chided his colleagues for "fail[ing] to give deference to EPA and impos[ing] the majority's own wishes instead" (id.). He added that where "an agency promulgates rules after a deliberative process, it is incumbent upon [the federal courts] to respect the agency's decisions or else risk trivializing the function of that agency"; and that "[i]n this case, EPA made a permissible decision to create a general permit program supported by NOIs" (id.).[12]

In Texas Indep. Producers & Royalty Owners Assn. v EPA (410 F3d 964 [7th Cir 2005] [Tex. Indep. Producers]), the United States Court of Appeals for the Seventh Circuit agreed with the dissenting judge in EDC that NOIs are not subject to the Clean Water Act's public participation requirements for NPDES permit applications. As mentioned earlier (see n 3, supra), EPA's Phase I stormwater regulations addressed construction activities involving five or more acres, and its Phase II stormwater regulations addressed construction sites that disturb one to five acres (as well as small MS4s). EPA eventually promulgated a

---

[12]The dissent comments that the Supreme Court "has chosen not to take up EDC," citing Texas Cities Coalition on Stormwater v EPA (541 US 1085 [2004])(dissenting op at 34-35). The Texas Cities Coalition sought Supreme Court review of its challenge to EPA's 1999 regulations, primarily on Tenth Amendment grounds.

general permit for stormwater discharges from both large and small construction sites in those jurisdictions where it had not authorized the state or an Indian tribe to administer the NPDES program.  This general permit required operators to submit an NOI to acquire coverage; a responsible corporate officer to certify the basis for eligibility for coverage; creation, maintenance and implementation of a site-specific Storm Water Pollution Prevention Plan (SWPPP), also to be certified by a corporate official; and implementation of best management practices necessary to comply with water quality standards, assure weekly site inspections and document those inspections, including detailing weather conditions.

In its petition for review, NRDC attacked the general permit's failure to make NOIs and SWPPPs available to the public and afford the opportunity for a public hearing, citing 33 USC §§ 1342 (j) and 1342 (a) (1).[13]  EPA responded that these provisions did not apply to NOIs and SWPPPs because NOIs and SWPPPs were not permits or permit applications.  The Seventh Circuit concluded that because the Clean Water Act spoke only of permits and permit

---

[13]Section 1342 (j) of the Clean Water Act provides that "[a] copy of each permit application and each permit issued under this section shall be available to the public.  Such permit application or permit, or portion thereof, shall further be available on request for the purpose of reproduction"; section 1342 (a) (1) authorizes the EPA "after opportunity for public hearing, [to] issue a permit for the discharge of any pollutant, or combination of pollutants" (see Environmental Conservation Law § 17-0805 [1] for the cognate provisions in state law).

applications, not NOIs or SWPPPS, the statute was silent or ambiguous for purposes of Chevron analysis. Accordingly, the court was called upon to decide whether EPA had reasonably construed the relevant provisions of the Clean Water Act.

In support of its interpretation, EPA "stressed" that general NPDES permitting did not "make use of a permit application"; rather, general permits were proposed through a notice in the Federal Register to solicit public comment, and "[i]t [was] at that time that the public [had] the opportunity to request a public hearing" (id. at 978). Once EPA issued the general permit as a final rule, a discharger intending to operate under the general permit's authority was required to comply with that permit's already established terms; therefore, "there [was] no need for additional public comment or a notice period," and potentially requiring a public hearing for individual NOIs and SWPPPs risked "eviscerat[ing] the administrative efficiency inherent in the general permitting concept, in effect making the general permit scheme no different from the process for obtaining individual permits[, which] would be inconsistent with Congress' intent to allow for the use of general permits" (id. [internal citations omitted]).

Calling these rationales "eminently reasonable," the Seventh Circuit concluded that "EPA's interpretation of the terms 'permit application' and 'permit' as not including NOIs and SWPPPs is a permissible construction" (id.). In so holding, the

court acknowledged that it disagreed with the EDC majority and agreed with the dissenting judge in that case, thus creating a split between the circuits (id. at 978, n 13).[14]

In sum, then, the federal circuit courts are split on the question of whether EPA has permissibly interpreted the Clean Water Act to mean that an NOI is not a "permit application."[15] And we obviously may not engage in Chevron analysis to review

---

[14]The parties disagree about the relevance of a third federal case, Waterkeeper Alliance, Inc. v EPA (399 F3d 486 [2d Cir 2005] [Waterkeeper Alliance]), which the United States Court of Appeals for the Second Circuit handed down after EDC and before Tex. Indep. Producers. This decision invalidated portions of EPA's 2003 regulations governing NPDES permitting for concentrated animal feeding operations (CAFOs), which are variously-sized but large-scale enterprises that raise animals like cows and pigs in confined quarters. Waterkeeper Alliance, however interpreted, does not eliminate the circuit split.

[15]We recognize that at least one statement in EPA's 1999 regulations does not appear facially consistent with its position in the EDC and Tex. Indep. Producers lawsuits. The EDC majority remarked that "[t]he text of [EPA's] Rule itself acknowledges that a Phase II NOI is a permit application that is, at least in some regards, functionally equivalent to a detailed application for an individualized permit" (EDC, 344 F3d at 853 [emphasis added]). In support of this proposition, the EDC majority (and the dissent; see dissenting op at 42, n 10) cite 40 CFR 122.34 (d) (1), which starts out by stating "[i]n your permit application (either a notice of intent for coverage under a general permit or an individual permit application)." Section 122.34 is written in a "readable regulation" format as an answer to the question "As an operator of a regulated small MS4, what will my NPDES storm water permit require?" It is the task of the federal courts, not this Court, to figure out whether section 122.34 (d) (1) or anything else in EPA's 1999 regulations is inconsistent with the Agency's litigation posture in EDC and Tex. Indep. Producers and, if so, the significance of the inconsistency.

EPA's interpretation, which underlies the corresponding, although not identical, parts of the 2010 General Permit to which NRDC objects. The federal courts and EPA will have to sort this out.[16] In that regard, NRDC has recently filed a petition for a writ of mandamus in the Ninth Circuit in the EDC case, asking that court to order EPA to amend its 1999 regulations within six months to provide individualized review of NOIs with notice and opportunity for public hearings. This is all the more reason, DEC argues, to reject "NRDC's attempt to litigate an underlying dispute with EPA by ordering relief against DEC for complying with EPA's regulations." We agree. Unless and until EPA revises its 1999 regulations, DEC's SPDES general permitting program for

---

[16]The dissent protests that our "'hands-off' approach would leave this court with no authority to consider the legality of state agency conduct, [which is] most certainly not the law, as made plain by [our] administrative law jurisprudence" (dissenting op at 42). The dissent then cites four cases, only one of which -- Seittelman v Sabol (91 NY2d 618 [1998]) -- involves federal law, and in Seittelman, the issue was whether we owed deference to a State agency's interpretation of a federal statute. Here, NRDC is asking us to decide that a federal agency -- EPA -- has improperly interpreted the statute it is tasked with administering. This is quite different from Seittelman. DEC operates the SPDES program as EPA's NPDES delegee, and is bound to follow EPA's interpretation of the Clean Water Act, here expressed, as challenged, in EPA's 1999 regulations. Federal law vests exclusive jurisdiction to review those regulations in the federal circuit courts (see 33 USC § 1369; see also Amer. Frozen Food Inst. v Train, 539 F2d 107, 124 [DC Cir 1976]). Under the dissent's view and notwithstanding section 1369 of title 33, the highest court in every state that administers the NPDES permit program would be empowered to second-guess EPA's governing regulations, creating an obvious impediment to implementation of a coherent nationwide NPDES permitting scheme.

small MS4s must comply with them (as it concededly does), and DEC
need not go beyond the specifications of those regulations unless
New York law requires it to do so.

### The Environmental Conservation Law

A SPDES general permit covers multiple entities with
similar characteristics and minimal impacts (see Environmental
Conservation Law § 70-0117 [6] [a]).  SPDES general permitting
allows DEC to avoid detailed review where it is not warranted and
thereby frees up finite regulatory resources for the individual
SPDES permitting of entities with greater impact on the
environment.  These were the reasons that DEC gave the
Legislature when it sought SPDES general permitting authority in
1988, after Congress endorsed NPDES general permitting in the
Water Quality Act, and the explanations that the legislation's
sponsors gave when the Environmental Conservation Law was amended
to empower DEC to issue SPDES general permits.

The Legislature has exhibited a continuing willingness
to simplify and streamline the SPDES permitting process to reduce
or eliminate administrative complexities that burden DEC and the
regulated community alike in ways that do not benefit the
environment.  For example, in 1994 the Legislature amended the
Environmental Conservation Law to expand general permitting and
require DEC to develop a priority ranking system for individual
SPDES permits in order to carry out an "Environmental Benefit
Permit Strategy" (EBPS) (see L 1994, ch 701).  Broadly described,

the EBPS prioritizes SPDES permits for full technical review and, when necessary, modification, in order to insure that those point source discharges presenting the greatest risk to the environment receive the most expedient and detailed regulatory attention (see generally TOGS 1.2.2 [Administrative Procedures and the Environmental Benefit Permit Strategy for Individual SPDES Permits," issued June 2003; revised Jan. 2012]; see also Environmental Conservation Law § 17-0805 [1] [b] [making a SPDES permit's priority ranking subject to an opportunity for a public hearing]).

NRDC and the dissent blur the distinction between SPDES general and individual permits by seeking to require DEC to undertake an undefined more comprehensive review of NOIs (and, apparently, to review SWMPs), and to provide an opportunity for a public hearing on NOIs/SWMPs. Thus, NRDC would like DEC to treat an NOI as though it were, or at least more like, an application for an individual SPDES permit to be issued rather than what it really is -- a request for coverage under a general SPDES permit that has already been issued pursuant to the full panoply of article 70 procedures (see Environmental Conservation Law § 70-0117 [6] [e]; 6 NYCRR part 621).[17] But the Environmental

_____

[17]In fact, the public enjoyed opportunities to participate in the development of the 2010 General Permit which exceed article 70's requirements. In the Fact Sheet issued with the 2010 General Permit, DEC explained that, in response to "significant public interest" in the 2008 General Permit, it limited that Permit's term to two years and embarked on an 18-

Conservation Law does not obligate DEC to conduct SPDES general permitting for small MS4s in accordance with NRDC's and the dissent's policy preferences.  SPDES general and individual permits represent <u>alternative</u> ways for small MS4s to obtain authorization for their stormwater discharges.  To the extent the courts force DEC to apply the same or similar procedures for both alternatives, the resource-conserving benefits sought by the Legislature when it enacted the 1988 legislation are compromised, if not altogether lost.

Here, DEC has determined that examining NOIs for completeness constitutes a sufficient level of technical regulatory review to qualify a small MS4 for initial coverage under the 2010 General Permit; and that the 2010 General Permit's public participation requirements for NOIs (i.e., notices in the Environmental Notice Bulletin to let the public know when a small MS4's NOI has been submitted to DEC and where the NOI and SWMP are physically located and may be inspected; making the NOI,

_____

month post-issuance review process.  All commenters on the 2008 General Permit were invited to participate, and DEC conducted nine monthly topic meetings to address Green Infrastructure, Intermunicipal Cooperation, Stormwater Retrofits, Public Participation, Numeric Effluent Limits, MS4 Funding, Steep Slopes, Riparian Buffers, Total Maximum Daily Loads and Impaired Waters.  Following these meetings, working drafts of a revised general permit and revised chapters of DEC's Stormwater Management Design Manual were reviewed with the participants. Meetings were held to discuss proposed changes to the Design Manual and the general permit; participants were invited to submit comments on the working drafts.  DEC incorporated beneficial provisions identified during this 18-month review in the 2010 General Permit.

which DEC posts on its website, subject to a pre-authorization 28-day public comment period) are sufficient. These are reasonable judgments that DEC possesses the discretion and expertise to make in furtherance of its responsibilities under the Environmental Conservation Law to regulate stormwater discharges from small MS4s (see Matter of Howard v Wyman, 28 NY2d 434, 438 [1971] ["It is well settled that the construction given statutes and regulations by the agency responsible for their administration, if not irrational or unreasonable, should be upheld"]; Matter of Davis v Mills, 98 NY2d 120, 125 [2002] ["(T)his Court treads gently in second-guessing the experience and expertise of state agencies charged with administering statutes and regulations"]).

We have reviewed NRDC's other challenges to the lawfulness of the 2010 General Permit and consider them likewise to be without merit. Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs.

Matter of Natural Resources Defense Council, Inc., et al. v New York State Department of Environmental Conservation

No. 48

RIVERA, J.(dissenting in part):

Petitioners are nine organizations or corporations, including lead petitioner, the not-for-profit Natural Resources Defense Council, Inc., whose several members use and enjoy New York State water bodies. Petitioners challenge New York's statewide general permit which allows storm water pollutant discharges from small Municipal Storm Sewer Systems. I concur with the majority to the extent it affirms dismissal of petitioners' claims as related to the "no net increase" provision and monitoring. However, because I conclude that the State's general permit as currently implemented fails to comply in several respects with federal and state statutory and regulatory mandates, I dissent.

I.

A. <u>Water Pollution Control and the Clean Water Act</u>

Long-standing concerns over contamination of New York's and the nation's waters have led to over a century of governmental controls and prohibitions on water pollution. As far back as 1903, New York State prohibited sewage and waste

discharge into public waters (see L. 1903, ch. 468).  There was also early federal concern with contamination of New York's water, as reflected by Congressional passage of laws in 1886 and 1888 prohibiting discharges of certain pollutants and refuse into New York Harbor (see L. 1886, ch. 929, § 3).

The Rivers and Harbors Appropriation Act of 1899 was the first statute to consolidate these and other prior federal prevention efforts, in order to establish nationwide water pollution controls.  The Act prohibited discharge of "any refuse matter of any kind or description whatsoever," into any navigable water of the United States without approval or a permit form the United States Army Corps of Engineers (see William L. Andreen, The Evolution of Water Pollution Control in the United States-State, Local, and Federal Efforts, 1789-1972: Part II, 22 Stan Envtl LJ 215, 220 [2003]; Section of Natural Resources, Energy, and Environmental Law, American Bar Association, The Clean Water Act Handbook, at 1 [3d Edition] [hereinafter "Clean Water Act Handbook"]).

Water pollution, however, remained unabated and continued to present serious public health issues (see Andreen at 222; 9 N.Y.Prac., Environmental Law and Regulation in New York § 6:2 [2d ed.]).  Congress eventually passed the Federal Water Pollution Control Act in 1948 (FWPCA) to address stream pollution which, as a result of World War II, had intensified due to "increased industrial activity and dramatically lower

expenditures on wastewater treatment" (Andreen at 235).  Under the FWPCA, the states bore primary responsibility for water pollution within their jurisdictions, and federal enforcement was limited (see Andreen at 238; see also 80 Cong. Ch. 758, June 30, 1948, 62 Stat. 1155).  Over time, Congress amended the FWPCA to provide financial assistance to municipalities in the form of grants to construct sewage treatment plants and to shore up federal enforcement (see Andreen at 240; 62 Stat. 1158).

As national concern increased over environmental degradation and the adverse impacts of water pollution on society and the economy, Congress established the Federal Water Pollution Control Administration (see Water Quality Act of 1965, Pub. L. No. 89-234, 79 Stat. 903), and the Environmental Protection Agency (EPA) (see 42 USC § 4321 [Reorganization Plan No. 3 of 1970 establishing the EPA]).  It also enacted the Water Quality Act of 1965 and the Water Quality Improvement Act of 1970.  This administrative and regulatory framework was intended to ensure the adoption and enforcement of appropriate water quality standards and pollution controls.

After these efforts failed to protect the nation's waters from dangerous levels of contamination, or to halt the continued decline of water quality, Congress passed a comprehensive revision and recodification of the FWPCA in 1972 (see Pub. L. No. 92-500, October 18, 1972 86 Stat. 816 [codified as amended at 33 USC §§ 1251-1376 (2000)]).  These amendments

form the basis for what is best known as the Clean Water Act.


        B.   The Clean Water Act and the National Pollutant
Discharge Elimination System


        The Clean Water Act (CWA) heralded the modern era of
federal water pollution control, with the stated objective to
"restore and maintain the chemical, physical, and biological
integrity of the Nation's waters" and the goal of eliminating
water pollution (see 33 USC § 1251 [a]).  It provided for more
robust federal enforcement of pollution controls and the
development and implementation of waste treatment programs (see
Andreen at 239-24).  It also declared unlawful "the discharge of
any pollutant by any person," to "navigable waters" from a "point
source" (see 33 USC § 1311 [a]) unless authorized by federal
permit, in accordance with the newly established national
pollutant discharge elimination system (NPDES) (see 33 USC § 1342
[a]).[1]

        This federal permit scheme, central to the CWA and
administered by the EPA, subjects permit holders to pollutant
discharge limitations as well as mandatory monitoring and

---

[1]The CWA defines point sources as "any discernible, confined
and discrete conveyance, including but not limited to any pipe,
ditch, channel, tunnel, conduit, well, discrete fissure,
container, rolling stock, concentrated animal feeding operation,
or vessel or other floating craft, from which pollutants are or
may be discharged" (33 USC § 1362 [14]; see also 40 CFR 122.2).

reporting requirements (see 33 USC § 1311 [b] [1] [A]; 33 USC § 1342 [b] [1] [A] [requiring SPDES permits to comply with § 1311]; see also Andreen at 261; Jeffrey M. Gaba, Generally Illegal: Npdes General Permits Under the Clean Water Act, 31 Harv Envtl L Rev 409, 410 [2007]).  While the NPDES permit "authoriz[es] some water pollution, [it] place[s] important restrictions on the quality and character of that licit pollution" (Waterkeeper Alliance, Inc. v U.S. E.P.A., 399 F3d 486, 491 [2d Cir 2005]).

The CWA imposes effluent limitations, which are "restriction[s]... on [the] quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters" (id., citing South Florida Water Mgt. Dist. v Miccosukee Tribe of Indians, 541 US 95, 100 [2004]).  The CWA defines effluent limitations as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance" (33 USC § 1362 [11]).  Certain effluent limitations are technology based, meaning they are "established in accordance with various technological standards that the [CWA] statutorily provides and that . . . vary depending upon the type of pollutant involved, the type of discharge involved, and whether the point source in question is new or already existing" (Waterkeeper, 399

F3d at 491). The CWA also provides for more stringent water quality-based effluent limitations when necessary to ensure state water quality standards (see 33 USC § 1311 [b] [C]). The technology-based and water quality-based limitations are generally represented as numerical limits on specific pollutant discharges (see Waterkeeper, 399 F3d at 491).

A permit is issued "upon condition that such [pollutant] discharge will meet . . . all applicable requirements including the effluent limitations statutorily required" by the CWA (id. at 498 [brackets omitted]). Thus, under the CWA's NPDES permit structure, "a discharger's performance is now measured against strict technology-based effluent limitations specified levels of treatment to which it must conform, rather than against limitations derived from water quality standards to which it and other polluters must collectively conform" (Environmental Protection Agency v California ex rel. State Water Resources Control Bd., 426 US 200, 204-05 [1976] [hereinafter "EPA"). As described by the United States Supreme Court

> "[a]n NPDES permit serves to transform
> generally applicable effluent limitations and
> other standards including those based on
> water quality into the obligations (including
> a timetable for compliance) of the individual
> discharger, and the Amendments provide for
> direct administrative and judicial
> enforcement of permits . . . In short, the
> permit defines, and facilitates compliance
> with, and enforcement of a preponderance of a
> discharger's obligations under the [Clean
> Water Act] Amendments"

(id. at 205 [internal citations omitted]).

The CWA itself "imposes only limited procedural obligations on the issuance of NPDES permits" (Gaba at 417). The process for obtaining a permit is specifically set forth in EPA regulations (see 40 CFR 122.21, et seq.).  As a general matter, an applicant must file an EPA permit application form (see 40 CFR 122.21 [a] [2]).  The application must be submitted at least 180 days before the applicant intends to commence discharging (see 40 CFR 122.21 [c] [1]), and no permit will issue if an application is deemed incomplete by the EPA (see 40 CFR 122.21 [e] [1]).

The CWA anticipates and requires certain opportunities for public participation.  As prominently set forth in the CWA Declaration of Goals and Policy, "[p]ublic participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the [EPA] or any State . . . shall be provided for, encouraged, and assisted by the [EPA] and the States" (33 USC § 1251 [e]). The EPA may issue a NPDES permit only "after opportunity for public hearing" (33 USC § 1342 [a] [1]), and "a copy of each permit application and permit issued . . . shall be available to the public" (33 USC § 1342 [j]).  In addition, the EPA regulations provide for public participation in the issuance of NPDES permits, including requiring notice and opportunity for comment on the denial of permit applications or the issuance of draft permits (see 40 CFR 124.10 [a] [i], [ii]), and the opportunity for a public hearing at the request of interested

parties (see 40 CFR 124.11).  The Administrator of the EPA shall hold a hearing where the Administrator "finds, on the basis of requests, a significant degree of public interest in a draft permit(s)" (40 CFR 124.12 [a] [1]), or "at [the Administrator's] discretion, whenever, for instance, such a hearing might clarify one or more issues involved in the permit decision" (40 CFR 124.12 [a] [2]).

Maximization of public involvement as a federally recognized goal is illustrated not only by the CWA's public participation requirement, but also by its statutory provisions authorizing private civil suits (see 33 USC § 1365).  Under the CWA, a person may commence a civil suit against individual polluters as well as federal and state government entities for failure to act in accordance with the law (see 33 USC §§ 1365 (A) (1),(A) (2).  Private actors have actively litigated the proper enforcement of the CWA and compliance with NPDES permits (see e.g. Los Angeles County Flood Control Dist. v Natural Resources Defense Council, Inc., 133 S Ct 710 [2013] [environmental organizations brought action against California municipal entities, alleging that they were discharging urban stormwater runoff into navigable waters in violation of the CWA]; Decker v Northwest Envtl. Defense Ctr., 133 S Ct 1326 [2013] [environmental organization brought action against Oregon officials and timber companies, alleging that they violated the CWA by discharging stormwater from ditches alongside logging

roads in state forest without NPDES permits]).


C.   State Pollutant Discharge Elimination System

The CWA also allows for a federally-authorized, EPA-approved state to issue permits "for discharges into navigable waters within" the state's jurisdiction (33 USC § 1342 [b]). Currently, a majority of states are EPA-approved to operate their own state pollutant discharge elimination system (SPDES). The laws of such state must "provide adequate authority to carry out the [permit] program" (33 USC § 1342 [b]), and the permits issued pursuant to this EPA authorization, must "apply, and insure compliance with, any applicable [CWA effluent limitations and standards]" (33 USC § 1342 [b] [1] [A]).

In 1975, the EPA authorized New York to issue permits under the state's SPDES, established pursuant to Article 17 of New York's Environmental Conservation Law. Thus, discharges or pollutants from point sources into the waters of the state are prohibited, unless authorized under New York's SPDES permit program (see ECL 17-0803; see also 33 USC § 1311 [a]). In accordance with the ECL, any discharges allowed by these permits shall

> "conform to and meet all applicable
> requirements of the [CWA] ... and rules,
> regulations, guidelines, criteria, standards
> and limitations adopted pursuant thereto
> relating to effluent limitations, water
> quality related effluent limitations, new
> source performance standards, toxic and
> pretreatment effluent limitations, ocean

discharge criteria, and monitoring, and to
participate in the [NPDES] created by the
[CWA]"

(ECL § 17-0801).  In addition to applicable federal requirements,

such permits are also subject to regulations issued by DEC (see 6

NYCRR 750, et seq.).

In New York, in order to obtain a permit, an interested

party must file an application (see ECL § 17-0803; 6 NYCRR

750-1.4 [a]).  The applicant must secure the permit prior to

actual discharge of any prohibited pollutant (ECL § 17-0803 ["it

shall be unlawful to discharge . . . without a SPDES permit"]; 6

NYCRR 750-1.4 [a] ["no person shall discharge . . . without a

SPDES permit"]).  As required by law, DEC reviews and, where

appropriate, approves the permit and issues a draft permit

setting forth the effluent limitations and other conditions

applicable to the discharger (ECL § 17-0809 [1]; 6 NYRR 750-1.10

[a]).

Public participation under New York's SPDES permit

program is advanced through public notice requirements and an

opportunity for public hearing on the permit application (see ECL

§ 17-0805 [b]; see also 6 NYCRR 750-1.12 [a] [requiring notice]).

The DEC must provide notice of every draft SPDES permit,

describing its terms and conditions, and must allow for a minimum

30-day public comment period (ECL § 17-0805 [b]).  During the

comment period, "[t]he department may, in its discretion, provide

an opportunity for the applicant or any interested agency, person

or group of persons to request or petition for a public hearing" (id.).


      D.  General Permits

As an alternative to the NPDES permit established by the CWA, the EPA passed regulations allowing the issuance of general permits "to cover one or more categories or subcategories of discharges . . . within a geographical area" (40 CFR § 122.28 [a] [1]).  A general permit "is a single NPDES permit that covers a number of individual discharges that would otherwise require individual NPDES permits" (Ohio Val. Envtl. Coalition v Horinko, 279 F Supp 2d 732, 758 [SDW Va 2003], citing 40 CFR 122.28; see also Environmental Defense Ctr., Inc. v U.S. E.P.A., 344 F3d 832, 853 [9th Cir 2003] ["A general permit is a tool by which EPA regulates a large number of similar dischargers"][Hereinafter EDC]).  Unlike the single-applicant NPDES permit process, under the general permit scheme, the permitting authority may issue a general permit "containing a common set of effluent limitations and other permit conditions that will apply to a potentially large number of point sources" (Gaba at 419).  As such, it provides for certain efficiencies and reduces the administrative burdens associated with an individual permit process (see Natural Resources Defense Council, Inc. v Costle, 568 F2d 1369, 1381 [DC Cir 1977] ["Area-wide regulation is one well-established means of coping with administrative exigency"]).

With the exception of the CWA's authorization for general permits allowing discharges of "dredged or fill material" (see 33 USC § 1344 [e] [1]), the CWA contains no special provisions for a category of "general permits," thus leaving the procedures and substantive contours of a general permit scheme to the EPA (see 40 CFR 122.28 [b]).[2]  Those EPA regulations allow states to issue general permits through their SPDES programs, in accordance with federal regulatory provisions (see 40 CFR 123.1 [c] ["The (EPA) Administrator will approve State programs which conform to the applicable requirements of this part"]).  All general permits, whether issued by the EPA or by an authorized state, must comply with the CWA and federal regulations (see 40 CFR § 123.25 [a]).

Since under a general permit program the permit is not issued for individual dischargers, but rather sets forth requirements that all applicants must satisfy in order to lawfully discharge pollutants, public participation under this scheme is provided through a notice and comment period directed at soliciting public comments on the contents of the general

_____

[2]Hence, explaining 1991 legislation wherein Congress mandated that the EPA "issue final regulations with respect to general permits for stormwater discharges associated with industrial activity on or before February 1, 1992" (Pub. L. No. 102-240, December 18, 1991, 105 Stat 1914).  In response, EPA implemented a general permit system for stormwater discharges from industrial activities (see National Pollutant Discharge Elimination System General Permits and Reporting Requirements for Storm Water Discharges Associated With Industrial Activity, 56 FR 40948-01).

permit (see 40 CFR 124.10 [requiring notice]; 40 CFR 124. 11 [allowing comment and requests for a hearing]).  Once the general permit is finalized and approved, applicants for whom the general permit is designed may submit a Notice of Intent (NOI) to comply with the permit and thus acquire coverage thereunder (see 40 CFR 122.28 [b] [2] [i]).

New York State implements a general permit program (see 6 NYCRR 750-1.21 [a]).  As defined in the ECL, a general permit "cover[s] a category of point sources of one or more discharges within a stated geographical area which (i) involve the same or substantially similar types of operations, (ii) discharge the same types of pollutants, (iii) requires the same effluent limitations or operating conditions, (iv) require the same or similar monitoring, and (v) which will result in minimal adverse cumulative impacts" (ECL 70-0117 [6][A]; see also 6 NYCRR 750-1.21).

II.

A.  Stormwater Pollutant Discharges

Congress amended the CWA in 1987 to provide for regulation of municipal and industrial stormwater discharges under the NPDES program (see 33 USC § 1342 [p]).  Stormwater, from rain and snow, is a highly significant source of water pollution, because it flows across all types of surfaces and washes various contaminants into municipal storm sewer systems which then drain into local water bodies.  According to the EPA,

> "[s]torm water runoff continues to harm the nation's waters. Runoff from lands modified by human activities can harm surface water resources in several ways[,] including by changing natural hydrologic patterns and by elevating pollutant concentrations and loadings.  Storm water runoff may contain or mobilize high levels of contaminants, such as sediment, suspended solids, nutrients, heavy metals, pathogens, toxins, oxygen-demanding substances, and floatables"

(40 CFR 122.30 [c]).  Regulation of stormwater discharges are particularly challenging because of the ever present rain and snow that lead to stormwater runoff, and the fact that third-parties may be the source of illicit discharges to storm sewer systems (see 64 Fed Reg 68, 789 ["EPA acknowledges the need to devise a regulatory program that is both flexible enough to accommodate the episodic nature, variability and volume of wet weather discharges and prescriptive enough to ensure protection of the water resource"]).

As provided under the CWA, the NPDES permit for municipal storm sewer discharges "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions the [EPA] Administrator or the State determines appropriate for the control of such pollutants" (see 33 USC § 1342 [p] [3] [B] [iii]).  The CWA does not define the maximum extent practicable standard.  However, it appears to provide broad authority to agencies to control stormwater pollution.

In 1990 and 1999, the EPA adopted rules regulating
Municipal Separate Storm Sewer Systems ("MS4s"), which are
systems designed to carry stormwater (see 40 CFR 122.26 [b] [8]).
The problems associated with regulating small MS4s are complex
because of these municipalities' limited resources, the sheer
numbers and diversity of the localities impacted by the general
permit system, and the opportunity for an MS4 drainage system to
cross geographic boundary lines, thus implicating multiple
government entities.

The federal regulations authorize state agencies to
issue general permits for such discharges (see 40 CFR 122.26 [a]
[5], 122.28 [a] [2] [i]).  According to the EPA regulations, the
state general permit must require that the MS4 "develop,
implement and enforce a storm water management program designed
to reduce the discharge of pollutants from [the] MS4 to the
maximum extent practicable (MEP), to protect water quality, and
to satisfy the appropriate water quality requirements of the
[CWA]" (see 40 CFR 122.34 [a]).  Further, the MS4's stormwater
management program (SWMP) "must include the minimum control
measures" set forth in the EPA regulations (id.).  The EPA has
also concluded that with respect to MS4s

> "narrative effluent limitations requiring
> implementation of best management practices
> (BMPs) are generally the most appropriate
> form of effluent limitations when designed to
> satisfy technology requirements (including
> reductions of pollutants to the maximum
> extent practicable) and to protect water
> quality. Implementation of best management

practices consistent with the provisions of
the storm water management program required
pursuant to this section and the provisions
of the permit required pursuant to § 122.33
constitutes compliance with the standard of
reducing pollutants to the 'maximum extent
practicable'"

(40 CFR 122.34 [a]).


B.  New York State's MS4 SPDES Stormwater Discharges
General Permit


In 2003, DEC issued a General Permit For Stormwater
Discharges for MS4s ("General Permit"), which applies to small
municipalities as defined in the federal regulations (see 40 CFR
122.26 [16]).  The General Permit was renewed for two years in
2008, and renewed again for five years in 2010.[3]  This single
General Permit currently covers 559 municipal separate storm
sewer systems, statewide.

The General Permit authorizes stormwater discharges by
small MS4 operators covered by the permit.  Coverage is effective
once the MS4 submits, and the State accepts as complete, an NOI
(see NYS DEC SPDES General Permit, Permit No. GP-0-10-002, at 2,
[hereinafter "General Permit"] ["Authorization under this SPDES
General Permit is effective upon written notification from the
[DEC] of the receipt of a complete NOI"]).  The New York NOI is a
form document filled out by an MS4.  It contains the MS4's

_____

[3] In anticipation of the General Permit's expiration on
April 30, 2010, DEC sent a public notice of an interim draft
renewal, effective for two years.

affirmances that it will comply with the general permit

requirements, and that it has developed an initial SWMP to be

implemented in accordance with the terms of the General Permit.

Under the General Permit scheme, an MS4

> "must develop (for newly authorized MS4s,
> implement), and enforce a SWMP designed to
> reduce the discharge of pollutants from small
> MS4s to the maximum extent practicable
> ("MEP") in order to protect water quality and
> to satisfy the appropriate water quality
> requirements of the ECL and the CWA.  The
> objective of the permit is for the MS4s to
> assure achievement of the applicable water
> quality standards"

(General Permit, "Part IV. Stormwater Management Program (SWMP),"

Subsection A, "SWMP Background," at 14).  The General Permit

requires the SWMP contain the six mandatory minimum control

measures set forth in the General Permit, and which mirror those

contained in the EPA regulations.  These control measures are

titled: (1) public education and outreach on stormwater; (2)

public participation in the development, implementation and

review of the MS4's SWMP; (3) development of a program for

detecting and eliminating "illicit discharges"; (4) development

of a program to control construction site stormwater runoff; (5)

post-construction stormwater management; and (6) pollution

prevention for municipal operations (General Permit, "Part VIII.

Minimum Control Measures - Traditional Non-land Use and Non-

traditional MS4s," at 49-67; see also CFR §§ 122.34 [b] [1]-[6]).

Also, DEC has identified for each minimum control,

certain mandatory "best management practices," to be utilized by the MS4 "to prevent or reduce the pollution of waters of the state" (General Permit, "Part X. Acronyms and Definitions," at 88). The MS4's SWMP must specifically set forth "measurable goals" for each management practice (see id. at 95). An MS4 documents the developed, planned, and implemented SWMP elements in a SWMP Plan (Plan),[4] which "describe[s] how pollutants in stormwater runoff will be controlled" (id. at 96).

In addition to the minimum controls and management practices identified by the DEC, an MS4 "must comply with all applicable technology-based effluent standards or limitations promulgated by EPA pursuant to" the CWA (General Permit, "Part VI. Standard Permits and Conditions," Subsection E. "Technology Standards," at 22). Further, "[i]f an effluent standard or limitation more stringent than any effluent limitation in the SPDES general permit or controlling a pollutant not limited in the permit is promulgated or approved after the permit is issued, the SWMP plan shall be promptly modified to include that effluent standard or limitation" (id.)

The ECL further requires that SPDES permits "insure compliance with water quality standards adopted pursuant to state

---

[4]The Plan may be created individually or with a group of covered municipalities, and is a separate document, not to be submitted with the NOI (see General Permit, "Part X. Acronyms and Definitions," at 96).

law" (ECL § 17-0811 [5]).  The EPA regulations also prohibit issuance of SPDES permits that do not "ensure compliance with applicable water quality requirements of all affected States" (see 40 CFR §§ 122.4 [d], 123.25 [a] [1], 122.44 [1], 123.25 [a] [15]).

The CWA requires a state to establish, as effluent limitations, water quality standards for the state's water bodies by designating uses for every waterway and the amount of permissible pollutants that may be present without impairing those designated uses (see 33 USC § 1313 [c] [2] [A]).  Where current technology-based pollution controls are ineffective to attain or retain water quality standards for a water body, then that body is considered "impaired" (see 33 USC § 1311 [d]).  The CWA requires that the states priority rank these impaired waters, "taking into account the severity of the pollution and the uses to be made of such waters" (see 33 USC § 1311 [d] [1] [A]), and calculate for each the total maximum daily load (TMDL) for the relevant pollutants that the water body may receive from all sources while still maintaining its water quality standards for any particular pollutant (id.).  The states must set reductions for sources responsible for discharging pollutants in order for the dischargers to meet the TMDL (see 33 USC § 1311 [d] [1] [C]).  As petitioners and the state recognize, it can take years to determine a TMDL.

For those impaired waters in New York that do not have

a TMDL, the state's General Permit has established interim measures to address stormwater discharges pending designation of the applicable TMDL.  In particular, effective the date the MS4 attains permit coverage, the MS4 must ensure "no net increase" in its discharge for certain pollutants, referred to as "pollutants of concern" and which are identified in the General Permit (see General Permit, "Part III. Special Conditions," Subsection B., "Impaired Waters," at 11, 101-108).  The General Permit includes pollutant load reductions for various water bodies in the state (General Permit, "Part IX. Watershed Improvement Strategy Requirements," Subsection C., "Pathogen Impaired Watershed MS4s," at 78).  Further, the MS4 must take all necessary actions to ensure future discharges do not cause or contribute to any existing violation of water quality standards.  In other words, the General Permit requires the MS4 maintain the pollutant level at status quo.  With respect to those water bodies for which New York has established a TMDL, the General Permit requires that the MS4 comply with the discharge reduction as "defined by the TMDL program" (General Permit, "Part III. Special Conditions," Subsection B "Impaired Waters," Subpart 2, "Watershed Improvement Strategies," at 12).

The MS4's affirmative agreement to comply with the General Permit requirements is represented in the NOI form, which consists mainly of a simplified checklist of the minimum control measures and management practices.  In other words, the MS4

selects from a "menu" of required and optional management

practices, and thus indicates which items the MS4 will employ to

meet a given minimum control measure.[5]  In order to select from

_____

     [5]For example, with respect to the minimum control measure
"Illicit Discharge Detection and Elimination," the NOI form
requires the MS4 include in its SWMP the following management
practices:

- • "Develop, implement and enforce a program to detect and
     eliminate illicit discharges to the MS4"

- • "Outfall and storm sewershed boundary mapping"

- • "field verify outfalls"

- • "outfall reconnaissance inventory"

- • "prohibit illicit discharges"

- • "Public, employees, business informed of hazards of
     illicit discharge"

- • "Adopt and enforce local law to prohibit illicit
     discharges"

- • "Adopt available mechanisms for to prohibit illicit
     discharges"

(see NYS DEC Phase II SPDES General Permit for Storm Water
Discharge from MS4s Notice of Intent, at 8 [hereinafter "NOI"]).

In addition to the required practices, the NOI lists, by short
phrases, several optional management practices for the applicant
to consider adopting:
- • "System mapping"

- • "address exempt non-stormwater discharges as necessary"

- • "Dye testing"

- • "shoreline surveys"

- • "system surveys"

the list, the MS4 need only fill in the circle corresponding to each management practice.  The NOI form also provides for a narrative description of "measurable goals," with start and end dates "that will be used for each best management practice for each of the minimum control measures" (NOI at 12-13).

                              III.

          Petitioners filed this hybrid CPLR article 78 proceeding and declaratory judgment action challenging portions of the General Permit as inconsistent with federal and state law. Petitioners requested the court remand the General Permit to DEC, with instructions that DEC modify the permit to conform with all applicable legal requirements.

          Our scope of review requires that we determine whether DEC's issuance of the General Permit "was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" to the extent that the permit's requirements violate state and federal law (CPLR 7803 [3]).  Contrary to the majority, I conclude that DEC is in violation of applicable mandatory statutory and regulatory requirements on two grounds.  First, DEC improperly grants coverage under the General Permit to an MS4, without a pre-coverage substantive review of the MS4's intended storm water discharge control measures.  Second, the state's General Permit scheme fails to provide members of the public with an opportunity

---

(id. at 8).

to request a hearing on the contents of a MS4's NOI and SWMP.


A.    New York's Small MS4 General Permit

Petitioners allege that the General Permit relies on an impermissible self-regulatory system, one that is dependent on the MS4 implementing pollution controls unverified by DEC for compliance with federal and state requirements.  Specifically, petitioners claim that under federal law, the General Permit must contain effluent limitations that reduce pollutant discharges to the "maximum extent practicable," and also ensure compliance with water quality standards.  Petitioners explain that New York's General Permit scheme fails to ensure the adoption of legally sufficient pollution controls because DEC authorizes an MS4 to develop and implement a stormwater discharge management program, without DEC first making an administrative determination that the specific measures chosen by the MS4 will satisfy statutory pollutant reduction standards.

DEC responds that by requiring an MS4 to adopt the six minimum control measures and certain best management practices, DEC has set the benchmark for compliance with the CWA's "maximum extent practicable" standard.  According to DEC, so long as the MS4 agrees to the minimum control measures and management practices, the MS4 has chosen a course of action that meets legal requirements.

The majority concludes that the General Permit is in compliance with the CWA and ECL, and that the petitioners merely seek for this Court to hold the SPDES General Permit to the same standards applicable to a SPDES individual permit, in contravention of the state legislature's intent (see majority op at 27-29). Essentially, the majority adopts DEC's position that the stormwater general permit scheme is lawful because it complies with EPA stormwater regulations and ECL requirements, and reflects the legislative preference for a streamlined regulatory process which reduces or eliminates administrative burdens (see id. at 27).

I agree with the majority that the General Permit is designed to reduce the administrative burdens associated with the SPDES individual permit program, and that our analysis of petitioners' claims must consider that these are different permitting schemes. Where I disagree with the majority is with its conclusion that the state's stormwater General Permit complies with the CWA and ECL when it does no more than allow those who seek to discharge pollutants to determine for themselves the pollution controls that satisfy the federal standard, and as a consequence insulate themselves from liability should they fall short of the federal mandate to reduce discharges to the "maximum extent practicable."

DEC's own description of the General Permit and its regulatory efforts establishes that DEC has created an

impermissible scheme that allows pollution without first ensuring that the MS4s' pollution controls comply with the CWA and ECL. While the General Permit sets forth certain control measures and management practices that every MS4 must incorporate as part of its pollutant discharge control program, the MS4 is wholly responsible for the task of identifying, developing and implementing the activities and measurable goals necessary to achieve the reduction of stormwater discharges to the "maximum extent practicable."  This is not itself unlawful because DEC could reasonably conclude there are administrative and substantive benefits associated with allowing the state's several hundred municipalities to develop pollution control programs designed to address local circumstances.  However, by leaving to an MS4 the development and adoption of its pollutant discharge controls, and granting General Permit coverage without DEC having reviewed the MS4's program to ensure compliance with the CWA and ECL, the state has abdicated its essential regulatory role, in violation of the CWA and ECL.[6]

The mechanics of the General Permit scheme are

---

[6]DEC contends it reviews every NOI before accepting it. However, DEC can point to only three instances in which it has rejected an NOI under the 2010 General Permit.  In all three, the offending MS4 failed to identify certain best management practices that it is implementing or intends to implement. Stated differently, DEC has only rejected NOIs where the MS4 left portions of the NOI's menu blank.  Despite DEC's contention to the contrary, this "review" hardly amounts to anything more than a "rubber stamp."

undisputed.  The General Permit replaces the individual permit system with a single permit applicable to a class of dischargers. New York's General Permit contains the six minimum control measures identified by the EPA as appropriate to reducing pollutant discharges to the maximum extent practicable.  DEC contends that it has determined that these measures can be achieved by application of certain best management practices and has included those in the General Permit, grouped according to their corresponding control measure.  Thus, the measures, as expanded by the specified management practices, are the foundation of the DEC's approach to ensuring an MS4's reduction of stormwater pollutant discharges within the mandates of the CWA.

In directing an MS4 to employ these control measures and management practices in order to achieve compliance with the "maximum extent practicable" standard, the General Permit does little to explain the standard, other than to state that if an MS4 utilizes all the applicable management practices it will satisfy the federal standard.  However, the text of the controls and management practices lacks the type of quantitative explication of objective standards which an MS4 can apply to assess whether its stormwater system's protocols actually reduce pollutant discharges to a legally sufficient level.

For example, the minimum control measure titled "Illicit Discharge Detection and Elimination," which refers to

mixed stormwater discharges such as sanitary sewage, garage drain effluent, and waste motor oil, requires as a management practice that an MS4 "develop, implement and enforce a program to detect and eliminate illicit discharges to the MS4" (see General Permit, "Part VII. Minimum Control Measures - Traditional Land Use Control," Subsection A "Traditional Land-Use Control MS4 Minimum Control Measures," Subpart 3 "Illicit Discharge Detection and Elimination [IDDE] - SWMP Development/Implementation, at 34-35). This, of course, says nothing more than that the MS4 must establish a program to comply with the law. This is but one example of the vague management practices that provide little by way of instruction on how an MS4 develops and implements specific controls to achieve sufficient reduction of discharge levels.

Each and every one of those six control measures requires that the MS4 "develop (for newly authorized MS4s), record, periodically assess, and modify as needed, measurable goals," and also that the MS4 "select and implement appropriate ... [activities or best management practices] and measurable goals to ensure the reduction of all [pollutants of concern] in stormwater discharges to the [maximum extent practicable]" (General Permit, "Part VII. Minimum Control Measures - Traditional Land Use Control" at 29, 33, 35, 39, 46). As the General Permit requires, the SWMP "describe[s] the best management practice/measurable goal, "identif[ies] time lines/schedules and milestones for development and

implementation"; includes "quantifiable goals to assess progress over time"; and describes "how the covered entity will address pollutants of concern" (General Permit, "Part X, Acronyms and Definitions," at 95). These are hardly the type of "highly specific" controls DEC claims them to be.

While the General Permit references other guidance, the guidance is non-binding. Moreover, it is still the case that the MS4 could choose to ignore the guidance, believing it has complied with the maximum extent practicable standard only to learn later that it has violated the CWA. This is not a merely speculative assessment of the General Permit structure because as the permit itself states

> "[i]f a covered entity chooses only a few of the least expensive methods, it is likely that MEP has not been met. On the other hand, if a covered entity employs all applicable BMPs except those where it can be shown that they are not technically feasible in the locality, or whose cost would exceed any benefit to be derived, it would have met the standard. MEP required covered entities to choose effective BMPs, and to reject applicable BMPs only where other effective BMPs will serve the same purpose, the BMPs would not be technically feasible, or the cost would be prohibitive"

(General Permit, "Part X. Acronyms and Definitions," at 91). As this suggests, something less than adoption of all of the management practices may comply with the maximum extent practicable standard, but when that would be the case and under what circumstances is uncertain and subject to the particularities of the MS4.

More significant than the opportunity for an MS4 to select additional management practices -- or even substitute mandatory best management practices with management practices the MS4 determines on its own are better suited or economically feasible, and yet still designed to ensure achieve reduction to the maximum extent practicable -- is the fact that, even if the mandatory management practices were clearer and specific, the General Permit does not, alone, set the limitations that each MS4 will implement.  Instead, DEC delegated that task to the MS4. The General Permit requires that in order to utilize the measures and management practices, the MS4 must determine the details and logistics of the management practices it has selected.  Thus, the General Permit scheme depends on each MS4's determination and eventual adoption of the most efficacious practices that the MS4 will apply to achieve the statutory goal of pollutant discharge reductions to the maximum extent practicable.

To that end, the General Permit specifically requires that the MS4 develop and implement a SWMP "designed to reduce the discharge of pollutants from the small MS4 to the maximum extent practicable [], to order to protect water quality, and to satisfy the appropriate water quality requirements of the ECL and [CWA]" (see General Permit, "Part IV. Stormwater Management Program (SWMP) Requirements," Subsection A. "SWMP Background," at 14). Although the General Permit requires the SWMP contain the six measures and the mandatory management practices, the SWMP does

more than merely recite them.  Rather, the SWMP expounds upon them, and thus reflects the MS4's determination of the appropriate limits necessary to achieve CWA compliance.

That determination is set forth in the "measurable goals" the MS4 develops for each of the management practices. These goals are intended to "help the covered entities assess the status and progress of their program" (General Permit, "Part X, Acronyms and Definitions," at 95).  They "should reflect the needs and characteristics of the covered entity and the areas served by its small MS4.  Furthermore, the goals should be chosen using an integrated approach that fully addresses the requirements and intent of the [minimum control measures]" (id. at 91).

This is not a static process, because as the General Permit indicates, "[t]he assumption is that the program schedules would be created over a 5 year period and goals would be integrated into that time frame" (id.).  Particularly troubling is the fact that DEC does not review the SWMP or the Plan.  In fact, it appears DEC has gone to great lengths to avoid formal consideration of both by prohibiting inclusion of the SWMP with the MS4's NOI, and by allowing up to 3 years after the effective date of permit coverage for the MS4 to develop and implement the Plan.

If, as DEC argues, all that is required to result in discharge reductions sufficient to comply with the CWA is the

employment of the minimum control measures and the mandatory management practices, there would be no need for municipal development and articulation of "activities," "measurable goals" and "other techniques."  In reality, the MS4 is left to details where none have been provided, and to craft a SWMP and Plan to guide the implementation of its storm water discharge reduction efforts.  Notably, DEC anticipates that those efforts will change over time, and thus allows the Plan to be developed and implemented up to three years after the MS4 gains coverage under the General Permit.

The majority concludes that "[t]here is no doubt that the 2010 General Permit complies with EPA's 1999 regulations" (majority op at 18).  However, those very same federal regulations for small municipal separate storm sewer systems were deemed to violate the CWA in EDC because they failed to provide for meaningful administrative review (see 344 F3d 832, 856 [9th Cir 2003]).  In that case, the Ninth Circuit Court of Appeals considered a challenge to the EPA's Storm Water Phase II Rule, under which small MS4s were authorized by an NPDES general permit to immediately commence the discharge of storm water after submitting an NOI.  Unlike the "traditional general permitting model," the court explained, "the Phase II Rule requires that each NOI contain information on an individualized pollution control program that addresses each of the six general criteria specified in the Minimum Measures" (id. at 853).  Under the Rule,

the EPA was not required to conduct a review of each NOI prior to discharge authorization, as it is required to conduct before granting an application for an individual permit (id. at 854-856).  The Ninth Circuit held that the permitting scheme violated 33 USC § 1342 (p) (3) (B) (iii) because "nothing prevents the operator of a small MS4 from misunderstanding or misrepresenting its own stormwater situation and proposing a set of minimum measures for itself that would reduce the discharges by far less than the maximum extent practicable" (EDC, 344 F3d at 855).  Moreover, "in order to receive the protection of a general permit, the operator of a small MS4 needs to do nothing more than decide for itself what reduction in discharges would be the maximum practical reduction.  No one will review that operator's decision to make sure that it was reasonable, or even good faith" (id.).  As a consequence, the "EPA would allow permits to issue that would do less than require controls to reduce the discharge of pollutants to the maximum extent practicable" (id. [emphasis in original]).  Accordingly, the court remanded that aspect of the Rule.

The Second Circuit applied similar reasoning to reject EPA's NPDES permitting scheme, albeit in a case involving different water pollutants, namely emissions from concentrated animal feeding operations (CAFOs) proscribed by the EPA's CAFO Rule.  In Waterkeeper, the Circuit Court concluded that the CAFO Rule did not require NPDES permitting authorities to review the

management plans to ensure that the plans were developed and implemented so as to reduce discharges as required by the federal regulations (Waterkeeper, 399 F3d at 500).

New York's General Permit similarly fails for the reasons articulated by the Circuit Courts in EDC and Waterkeeper. Although the Appellate Division concluded that the General Permit "includes[s] a variety of enforcement measures that are sufficient to comply with the maximum extent practicable standard" (Natural Resources Defense Council, Inc., 120 AD3d at 1243), that is besides the point because the issue is not the propriety of the measures or the management practices, because those alone do not establish the details of any particular MS4's stormwater discharge program. Indeed, petitioners do not challenge DEC's choice of minimum controls or management practices. Rather, they challenge DEC's failure to assess for legal adequacy the pollutant discharge proscriptions actually developed by the municipalities, and intended to be applied by the MS4s.

The fact that DEC provides a menu of management practices cannot save the General Permit scheme because "nothing requires that the combination of items that the operator of a small MS4 selects from this 'menu' will have the combined effect of reducing discharges to the maximum extent practicable" (EDC, 344 F3d 832, n 32). Moreover, it is not the amount of choices that matters here--as the DEC suggests by arguing that it imposes

forty four mandatory management practices--because more practices
are meaningless if there is no assessment as to whether the MS4
understands how those practices work and how to apply them to
ensure pollutant discharge reduction to the level required by the
CWA. This is certainly the case here where the CWA's maximum
extent practicable standard is intentionally undefined, and where
DEC's management practices are vague and generalized, often
redundant of the minimum controls.

      The majority appears to marginalize the decision in
EDC, characterizing it as part of a Federal Circuit Court split
(see majority op at 25).[7]  However, in EDC, the Ninth Circuit
vacated the EPA regulations to the extent they did "allow permits
to issue that would do less than require controls to reduce the
discharge of pollutants to the maximum extent practicable" (EDC,
344 F3d at 855-56, citing 64 Fed. Reg. at 68753).  Rather than a
division among the Circuit Courts, the Ninth Circuit decision is
the only Circuit decision on the validity of the regulations'
content.  While the United States Supreme Court is the final word
on the proper interpretation of the CWA and the EPA regulations,
that Court has chosen not to take up the case (see Texas Cities
Coalition on Stormwater v E.P.A., 541 US 1085 [2004] [denying
petition for writ of certiorari]).  Moreover, the Ninth Circuit
decision has affected the EPA's application of the regulations.

---

    [7]The majority treats Waterkeeper similarly, relegating it to
a footnote because that decision, "however interpreted, does not
eliminate the circuit split" (see majority op at 25 n 14).

Indeed, the EPA issued post-EDC guidance to Water Management

Division Directors stating that "[t]he permitting authority will

need to conduct an appropriate review of Phase II MS4s' NOIs to

ensure consistency with the permit."[8]

Even assuming we could simply ignore that the EPA

regulations have been vacated in relevant part, notwithstanding

the majority's conclusion that the state's General Permit

"concededly" complies with the EPA regulations, the fact is that

the EPA regulations require implementation of best management

practices consistent with the SWMP (see 40 CFR 122.34 [a]

["Implementation of best management practices consistent with the

provisions of the storm water management program required

pursuant to this section and the provisions of the permit

required pursuant to § 122.33 constitutes compliance with the

standard of reducing pollutants to the 'maximum extent

practicable'"]).  Therefore, so long as DEC allows General Permit

coverage to an MS4 without ensuring the intended consistency

between management practices and the individualized protocols set

forth in the SWMP, the state is in violation of the CWA (see 33

---

[8]This guidance pre-dates the Seventh Circuit's decision in
Texas Ind. Producers and Royalty Owners Assn. v E.P.A. (410 F3d
964 [7th Cir 2005]) which held, contrary to the Ninth Circuit,
that NOIs are not subject to the CWA public participation
requirements.  However, the EPA guidance has not been rescinded
and there is nothing to suggest the obsolescence of the guidance
with respect to agencies ensuring consistency with the permit and
compliance with the CWA.

USC § 1342 [p] [3] [B] [iii] [providing that MS4 permits "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants"]).

It is undeniable that DEC has made efforts to adopt a general permit scheme that complies with the CWA and ECL, and which provides an administratively feasible approach to the difficult task of reducing stormwater pollutant discharges. Nevertheless, DEC's current approach is legally impermissible. Of course, it is for the state, and not the judiciary, to establish the state's review and assessment protocols (see Akpan v Koch, 75 NY2d 561, 570 [1990] ["courts may not substitute their judgment for that of the agency for it is not their role to weigh the desirability of any action or to choose among alternatives"]). It very well may be that the state determines, as have other jurisdictions,[9] that review of the SWMP and the

---

[9]Texas and Mississippi, for example, require the submission of a full SWMP contemporaneously with the filing of an NOI for substantive review (see Texas Commission on Environmental Quality, General Permit to Discharge Under the Texas Pollutant Discharge Elimination System, § II.E.1 [2013] available at https://www.tceq.texas.gov/assets/public/permitting/stormwater/txr040000_issued_permit.pdf [accessed April 13, 2015]; Mississippi Department Environmental Quality, Separate Storm Sewer System (MS4) General Permit, Condition S-1. [2009] available at http://www.deq.state.ms.us/mdeq.nsf/pdf/epd_MS4PhaseIIStormWaterGeneralPermit/$File/22General.pdf?OpenElement [accessed April 14, 2015]).

Plan is but one way by which the state may comprehensively and expeditiously comply with its regulatory mandate. How best to address this issue should be left to New York.

### B. Public Participation Requirements

Petitioners argue that DEC violates statutory public participation requirements by failing to provide an opportunity for public comment and to request a public hearing on a MS4's NOI and SWMP, prior to DEC's authorization of coverage under the General Permit. DEC currently provides a full public notice and comment period and an opportunity to request a public hearing on the General Permit, and DEC also affords an additional 28 day pre-coverage public comment period with respect to each NOI (see General Permit, "Part II. Obtaining Permit Coverage," at 8). The majority concludes this meets all applicable legal requirements. I disagree and would find that the CWA and ECL require more pre-coverage public participation. Specifically, because the NOI and SWMP must contain the MS4s' pollution controls, and the SWMP must be developed in advance of the NOI, which is then submitted to obtain coverage under the General Permit, DEC must provide an opportunity to request a public hearing for any particular NOI and SWMP.

Congress explicitly sought to encourage public participation in the development and implementation of the nation's water pollution control measures, and required that the

EPA and the states provide for, encourage, and assist with "public participation in the development, revision and enforcement of any regulation, standard, effluent limitation, plan or program established by the [EPA] or any State" (33 USC § 1251 [e]).  The intended transparency of the process is reflected in the CWA requirement that permit applications, and the NPDES and SPDES permits themselves be made public (see 33 USC § 1342 [j]).  With respect to the demand for administrative hearings, the CWA provides that the EPA may issue a permit "after an opportunity for public hearing" (see 33 USC § 1342 [A] [1] [emphasis added]).

The ECL also mandates public participation with respect to SPDES coverage.  State law requires "[p]ublic notice of a complete application for a SPDES permit" (ECL § 17-0805 [1] [a]), which shall include "a statement that written comments or requests for a public hearing on the permit application ... may be filed by a time and at a place specified" (ECL 17-0805 [a] [ix]).  The public comment shall last "not less than thirty days following the date of the public notice  . . .  during which time interested persons may submit their written views with respect to the application and the priority ranking of the permit" (ECL § 17-0805 [1] [b]).

Petitioners argue that the public should have the opportunity to request a hearing on the contents of the NOI and SWMP because both contain the MS4's pollution controls.

Petitioners are correct that an MS4 must identify and list in the NOI its chosen management practices, and it must include in the SWMP the controls to reduce the discharge pollutants in accordance with the maximum extent practicable standard. Thus, the NOI and SWMP not only affirm that the MS4 will comply with the General Permit's terms, but they also explain how the MS4s will meet legal requirements, based on the localities' unique circumstances. Indeed, to ensure for itself that an MS4 understands its duties and obligations, the DEC must refer to the NOI and SWMP.

Here, DEC issued a General Permit for the specific purpose of allowing storm water pollutant discharges by a covered MS4, where an MS4 has agreed to meet conditions set forth in the CWA, ECL, federal and state regulations, and the General Permit. A cursory review of the General Permit makes clear that it is not specific to any particular MS4, but rather it is generic, intended to set forth the minimum requirements identified by DEC, which must be complied with by every MS4 seeking coverage under the General Permit. However, as DEC has vigorously contended, General Permit coverage is not automatic, but requires that the MS4 submit an NOI which DEC must then accept as complete.

According to the General Permit, the NOI affirms that a SWMP has been developed. As the parties concede, the NOI and SWMP contain what DEC considers to be the mandatory limitations and measurable goals an MS4 proposes to implement in order to

ensure stormwater pollutant discharge reduction to the maximum extent practicable, as required by the CWA. Clearly, then, submission of a completed NOI, based as it is on an initial SWMP, is the MS4's entree to the General Permit system, and is a necessary step to securing authorization to lawfully discharge pollutants in accordance with the CWA and ECL.  If the NOI, and the prerequisite SWMP, do not constitute a permit application, then what other avenue does an MS4 have to secure permit coverage and authorization to lawfully discharge pollutants?  The NOI and SWMP constitute an application in everything but name.

The DEC argues that the CWA and ECL public hearing requirements apply only to individual permit applications, and that public participation requirements are satisfied because the public has the opportunity to submit comments and request a public hearing regarding the General Permit itself.  The EPA similarly argued in Texas Ind. Producers and Royalty Owners Assn. v E.P.A. (410 F3d 964 [7th Cir 2005]).  In that case, the Seventh Circuit Court of Appeals agreed with the EPA that the CWA did not require the agency to provide a comment period or an opportunity to request a public hearing on NOIs and Storm Water Pollution Prevention Plans (SWPPP) submitted under the EPA's "Final National Pollutant Discharge Elimination System General Permit for Storm Water Discharges From Construction Activities."  The Court concluded that the CWA was ambiguous as to whether NOIs and SWPPPs are "permits" or "permit applications", and in accordance

with Chevron, U.S.A., Inc. v Natural Resources Defense Council, Inc. (467 US 837 [1984]), judicially deferred to the EPA's interpretation of those statutory terms (see Texas Ind. Producers, 410 F3d at 978). The Court accepted as reasonable EPA's argument that individual public hearings for NOIs and SWMPPPs would eviscerate the administrative efficiency of the general permit scheme (id.).

In contrast, in EDC, the Ninth Circuit had previously rejected the EPA's argument that the CWA public hearing opportunity requirement did not apply to NOIs because they are not "permits". Instead, the Ninth Circuit held that the "NOI establishes what the discharger will do to reduce discharges to the 'maximum extent practicable'" and therefore is "functionally equivalent to a detailed application for an individualized permit" (344 F3d at 853).

The majority contends that the federal courts will have to resolve this "circuit split," and concludes that DEC's general permit scheme is permissible because it complies with the EPA's regulations and New York's law does not require more. I disagree because the majority's conclusion is unsupportable on the record before us.

Notably, the EPA's position in both cases is counter to the EPA's own description in its stormwater regulations that a permit application is inclusive of "a notice of intent for coverage under a general permit" (40 CFR 122.34). This

inconsistently alone undermines the state's argument that the NOI
is something other than a permit or permit application.[10]

Additionally, the majority's "hands-off" approach would
leave this court with no authority to consider the legality of
state agency conduct.  That is most certainly not the law, as
made plain by this Court's administrative law jurisprudence (see
Seittelman v Sabol, 91 NY2d 618, 625 [1998] [invalidating state
regulation that was "inconsistent with the controlling Federal
statute it was intended to implement"]; see also Kurcsics v
Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980][the Court
affords an agency no deference if its interpretive regulations
"run[] counter to the clear wording of a statutory provision"];
Raritan Dev. Corp. v.Silva, 91 NY2d 98 [1997] [holding that "when
an [agency] interpretation is contrary to the plain meaning of
the statutory language," the Court may overrule and "decline to

---

[10]The majority holds that while 40 CFR 122.34 "does not
appear facially consistent" with the EPA's position in EDC and
Texas Ind. Producers, that section of the EPA's regulations is
part of a "question and answer" format intended to clarify
requirements applicable to regulated small MS4s (see majority op
at 25 n 15).  Therefore, according to the majority, it is for the
federal courts to determine whether the regulations are
inconsistent with the EPA's position in those federal cases.
However, whether the EPA has taken a position at odds with what
DEC now asserts is the correct and intended interpretation of the
federal regulations is, of course, relevant to this Court's
analysis of DEC's defense to petitioners' claims.  Turning to the
regulations, it is clear from the text of 40 CFR 122.34 (d) (1)
that a small MS4's NOI is a general permit application.
Notwithstanding the majority's word play, there is no avoiding
that the federal regulations are inconsistent with the EPA's
position in EDC and Texas Ind. Producers.

enforce an agency's conflicting application thereof"]; <u>Matter of</u>

<u>New York Statewide Coalition of Hispanic Chambers of Commerce v</u>

<u>New York City Dept. of Health & Mental Hygiene</u>, 23 NY3d 681

[2014] [striking down the New York City Board of Health's

restriction on soda portions as exceeding its regulatory

authority given by the legislature]).[11]  Moreover, absent binding

precedent from the United States Supreme Court, there is no legal

impediment to this Court interpreting federal law (see <u>Flanagan v</u>

<u>Prudential-Bache Sec., Inc.</u>, 67 NY2d 500, 506 [1986] ["When there

is neither decision of the Supreme Court nor uniformity in the

decisions of the lower Federal courts . . . a State court

required to interpret [a] Federal statute has the same

---

[11]The majority argues that DEC, as the permitting agency,
must follow the EPA's interpretation of the CWA, but contends
that I suggest every state's high court may second-guess the EPA
(see majority op at 27 n 16).  However, my point is not that we
can decide counter to the EPA, but rather that the Ninth Circuit
already has, and we cannot ignore that fact or the Ninth
Circuit's analysis, even if DEC and the majority would have it
otherwise.
    There is also no support for the majority's concern that our
review poses a potential "impediment to implementation of a
coherent nationwide NPDES permitting scheme" (id.).  The EPA
provides that while SPDES permits must comply with federal
regulations and the CWA, "[n]othing in the [regulations]
precludes a State from . . .[a]dopting or enforcing requirements
which are more stringent or more extensive than those required
[by the EPA]" (40 CFR 123.1 [h] [i] [1]).  Nor is there a legal
impediment to "[o]perating a program with greater scope of
coverage than that required [by the federal regulations]" (40 CFR
§ 123.1 [h] [i] [2]).  Indeed, the EPA expressly requires MS4s to
"comply with any more stringent effluent limitations in [their
State-issued] permit" (40 CFR 122.34 [e] [1]).  It would appear,
then, that differences among the Circuit Courts are the more
likely obstacles to national uniformity.

responsibility as the lower Federal courts and is not precluded from exercising its own judgment . . . "]).

We should reject DEC's argument because under the general permit scheme the NOI and SWMP replace an individual permit application.  To adopt approvingly DEC's position, and EPA's argument in Texas Ind. Producers, fails to sufficiently interrogate the general permit regulatory scheme, or fully appreciate the role of the general public in the general permitting process.  Moreover, the court's conclusion that requiring public hearings for each individual NOI and SWPPP would be inconsistent with Congressional intent is not supported by the language of the CWA.  The stated purpose of that statute is to restore and maintain the integrity of the nation's waters, eliminate the discharge of pollutants into navigable waters, and ensure public participation in the development and implementation of any "plan or program" administered under the CWA by the states.  While there may be administrative efficiencies supporting the use of a general permit scheme, they do not outweigh the explicit objectives and goals of the CWA to protect the country's waters.  In any event, because the EPA regulations allow for individual permits even where a general permit is in place, the efficiency argument propounded by the DEC and EPA is underwhelming (see 40 CFR 122.28 [b] [3] [i]).

What is actually counter to the intent of the CWA is to provide an opportunity to request a public hearing in cases

involving individual permits, while denying the same under a statewide general permit scheme involving pollutant discharges from hundreds of MS4s.  The latter potentially implicates the integrity of local water bodies more significantly than the actions of any single polluter, and therefore requires the type of public scrutiny and engagement envisioned by the CWA (see 33 USC § 1342 [a] [1] [the EPA may issue a NPDES permit only "after opportunity for public hearing"]).

Therefore, DEC's determination that neither the CWA nor the ECL requires an opportunity for a public hearing on the NOIs and SWMPs, prior to DEC granting permit coverage, ignores the obvious purpose and role of these documents, and undermines the CWA's public participation requirement.  As such, DEC's interpretation is not entitled to deference, and is, for the reasons I have stated, arbitrary and capricious. Therefore, the NOI and SWMP should be subject to statutory public participation requirements that include the opportunity to request a public hearing.

III.

Accordingly, the 2010 General Permit does not provide for adequate review of NOIs or meaningful public participation in accordance with the CWA.  Thus, I would modify the Appellate Division order to remit the Permit to DEC for compliance.  I agree with the majority that petitioners' remaining contentions

are without merit (<u>see</u> majority op at 30).

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order, insofar as appealed from, affirmed, with costs.  Opinion by Judge Read.  Judges Pigott, Abdus-Salaam and Stein concur.  Judge Rivera dissents in part in an opinion in which Chief Judge Lippman and Judge Fahey concur.


Decided May 5, 2015